[Crim. No. 258.   Third Appellate District.—April 14, 1914.]

# In the Matter of Application of A. PARRA for a Writ of Habeas Corpus.

FISH AND GAME LAWS—LICENSE FOR FISHING—POWER OF LEGISLATURE TO EXACT.—The act of the legislature (Stats. 1913, p. 985) imposing a license tax of ten dollars a year for the privilege of fishing for profit in the waters of the state, is valid, and does not violate section 25 of article I of the constitution which grants to the people of the state the right to enter upon the lands of the state for the purpose of fishing in the waters thereon.

ID.—PROTECTION OF FISH—IMPOSITION OF LICENSE.—The imposition of such license has a tendency to protect fish and prevent their extermination, and section 25½ of article IV of the constitution expressly authorizes the legislature to enact laws for that purpose.

ID.—CONSTITUTION—PURPOSE OF SECTION 25 OF ARTICLE I.—The principal object of section 25 of article I of the constitution is to reserve to the people the right to fish upon the public lands of the state and to require that grants of land by the state should not be made "without reserving to the people the absolute right to fish thereupon."

APPLICATION for a Writ of Habeas Corpus.

The facts are stated in the opinion of the court.

John R. Cronin, for Petitioner.

R. D. Duke, and Malcolm C. Glenn, for Respondent.

CHIPMAN, P. J.—Petitioner was arrested, on March 14, 1914, in Solano County for engaging in the vocation of fishing for profit in the public waters of this state, to wit, in the straits of Carquinez, in said county, without having first obtained a license therefor as required by the act of the legislature approved March 13, 1909 (Stats. 1909, p. 302), and the act approved March 16, 1913 (Stats. 1913, p. 985), being an act amendatory of section 3 of the said act of March 13, 1909, "by spreading out in said waters, and placing therein, a certain net known as a salmon net for the purpose of taking and catching salmon from the said waters."

The sufficiency of the complaint, or warrant of arrest, is not disputed. The claim of petitioner is "that he has the right to engage in the vocation of fishing for profit (or for pleasure) without the payment of any license therefor, and that this right is secured to him by virtue of the provisions of section 25 of article I of the constitution of the state." This section was adopted in 1910 and reads as follows:

"The people shall have the right to fish upon and from the public lands of the state and in the waters thereof, excepting upon lands set aside for fish hatcheries, and no land owned by the state shall ever be sold or transferred without reserving to the people the absolute right to fish thereupon; and no law shall ever be passed making it a crime for the people to enter upon the public lands within this state for the purpose of fishing in any water containing fish that have been planted therein by the state; *provided,* that the legislature may by statute, provide for the season when and the conditions under which the different species of fish may be taken."

This section must be read in connection with section 25½ of article IV, adopted in 1902, for the two sections do not in anywise conflict with each other. This section reads:

"The legislature may provide for the division of the state into fish and game districts, and may enact such laws for the protection of fish and game therein as it may deem appropriate to the respective districts."

The act of 1909 is entitled: "An act to regulate the vocation of fishing, and to provide therefrom revenue for the propagation, restoration and preservation of fish in the waters of the state of California." Section 3 provides for the issuance of licenses for the privilege of fishing, and the amount to be paid for each year. The act of 1913 is amendatory of section 3 of the act of 1909 and fixes the license fee at ten dollars per annum.

Petitioner's contention is that, by the adoption of the constitutional amendment of 1910, now section 25 of article I, the act of 1909 relating to license fees for fishermen became null and void and of necessity the like fate befell the amendment of section 3 of the amendatory act of 1913. We quote from petitioner's brief so much as fairly states his position, preserving his italics:

"It is contended by and on behalf of petitioner, that with the adoption of the constitutional amendment in 1910, now section 25 of article I of our state constitution, that the act of 1909 relating to license fees for fishermen became null and void, and that, of necessity, the act of 1913, amendatory of section 3 of the act of 1909, is null and void, as being in direct conflict with the provisions of section 25 of article I of our state constitution.

"The only portion of that part of our state constitution which gives to the legislature any power in the matter of regulating the business or pleasure of fishing is contained in the proviso *'that the legislature may by statute, provide for the season when and the conditions under which the different species of fish may be taken.'* There is no question here as to the right of the legislature to provide for the 'season,' as that is quite clear. Then the entire question hinges on what was meant by the words *'and the conditions under which the different species of fish may be taken.'* The word 'conditions' is qualified by the words that follow it *'under which the different species of fish may be taken,'* which, it is contended, clearly refer to such physical conditions connected with the taking of the fish, such as the size of the net, the size of the fish, the prevention of the use of explosives, and other kindred conditions under which the different species of fish may be taken. Without this proviso, the legislature would be inhibited from making any regulation save and except the question of the length of the season.

"To give to the proviso, as used in and in connection with the whole of section 25, the construction that thereby the legislature might impose a license fee (which might be prohibitive in its nature and which is even now prohibitive to some), would tend to frustrate and nullify the express declaration contained in that part of our state constitution which says that *'no law shall ever be passed making it a crime for the people to enter upon the public lands within this state for the purpose of fishing in any water containing fish that have been planted therein by the state.'* "

By section 25½ of article IV, power is given to the legislature "to enact laws for the protection of fish and game as it may deem appropriate for the respective districts" into which the state may be divided; and by section 25 of article I, "the

legislature may by statute provide for the season when and the conditions under which the different species of fish may be taken.'' If, as is contended, the clause last quoted refers only ''to such physical conditions connected with the taking of the fish, such as the size of the net, the size of the fish, the prevention of the use of explosives and other kindred conditions under which the different species of fish may be taken,'' we yet have section 25½ of article IV, which gives the power to the legislature to enact such laws as it may deem appropriate ''for the protection of fish and game'' in the state. We need not, therefore, concern ourselves particularly as to what was intended by the later provision if the imposition of a license to fish for profit can be upheld as ''appropriate'' for the ''protection of fish.'' We venture to say, however, that the principal object of section 25 of article I was to preserve to the people the right to fish upon the public lands of the state, and to require that grants of land by the state should not be made ''without reserving to the people the absolute right to fish thereupon.''

The question of the power of the state to control or regulate the taking of fish and game, and their preservation for the benefit of the people at large has been the subject of many decisions, to only a few of which need we advert.

In *Geer* v. *Connecticut*, 161 U. S. 517, 532, [40 L. Ed. 793, 16 Sup. Ct. Rep. 600], the supreme court, by Mr. Justice White (now chief justice), said:

''So far as we are aware, it has never been judicially denied that the government under its police powers may make regulations for the preservation of game and fish, restricting their taking and molestation to certain seasons of the year, although laws to this effect, it is believed, have been in force in many of the older states since the organization of the federal government. . . . The ownership being in the people of the state, the repository of the sovereign authority, and no individual having any property rights to be affected, it necessarily results that the legislature, as the representative of the people of the state, may withhold or grant to individuals the right to hunt and kill game or qualify or restrict, as in the opinions of its members will best subserve the public welfare. Stated in other language, to hunt and kill game is a boon or privilege, granted either expressly or impliedly by the sovereign au-

thority—not a right inherent in each individual, and consequently nothing is taken away from the individual when he is denied the privilege at stated seasons of hunting and killing game.  It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the state, and hence by implication it is the duty of the legislature to enact such laws as will best preserve the subject of the trust and secure its beneficial use in the future to the people of the state.  But in any view, the question of the individual enjoyment is one of public policy, and not of private right.''

It was held, in *State* v. *Hume,* 52 Or. 1, 6, [95 Pac. 808, 810], that migratory fish in the navigable waters of a state, like game within its borders, are classed as animals *feræ naturæ,* the title to which, so far as title can be asserted before possession, is in the state in trust for all its citizens, and that the legislature may enact such laws as tend to protect the species from injury by human means, and from extinction by exhaustive methods of capture.  In *Smith* v. *State,* 155 Ind. 611, [51 L. R. A. 404, 406, 58 N. E. 1044], it was said: ''The individual has no natural right to take game, or to acquire property in it, and all the right he possesses or can possess in this respect is granted him by the state.''  In *State* v. *Hume,* it was further said: ''The unrestricted taking, from navigable streams, of fish that are valuable for food, usually causes their extermination, to prevent which, and to afford time and opportunity for an increase of the species, laws have been passed limiting the time and manner, or temporarily prohibiting the catching of them, which enactments have been upheld as legitimate exercise of the police power, employed by a state to protect the welfare of all its citizens.''  Similar views were expressed in *Sherwood* v. *Stephens,* 13 Idaho, 399, [90 Pac. 345].  In *Morgan* v. *Commonwealth,* 98 Va. 812, 814, [35 S. E. 448, 449], a license-tax for the privilege of fishing in the waters belonging to the state was upheld as not in violation of the state or national constitution.  ''If,'' said the court, ''the state has a right to require a license-tax of merchants and others engaged in business upon their own capital, it certainly has the right to require a license-tax of those carrying on their business as do the fishermen mentioned in the statute.''  In *State* v. *Hanlon,* 77 Ohio St. 19, 29, [82 N. E. 663, 664], it was said:

"In the present case the section under review is one of the sections of an act entitled: 'An act for the further and better protection of fish and game.' · If the true purpose and object of this act is expressed in its title, as would seem apparent from a consideration of the other provisions of said section, one of which is, 'All fees required to be paid hereunder shall be paid to the president of the commissioners of fish and game, and by him paid into the state treasury to the credit of a fund, which is hereby appropriated, for the purpose of propagating, protecting and preserving the fish in the waters of Lake Erie'—then certainly the imposition, for such purpose, of a license-fee upon all persons who engage in the business of fishing with nets in the waters of Lake Erie, is a proper exercise of legislative power."

Of the police power, Freund on Police Power, page 19, says: "The police power is the power to restrain common rights of liberty to property. When it is sought to exercise rights which are not common or fundamental, still more when special privileges are asked, the state may grant the required permit or license upon such conditions as it pleases, without observing the limitations which otherwise hedge about the exercise of the police power." The restrictions upon the right to fish and pursue game are given among other "conspicuous illustrations" of the exercise of power respecting cases of qualified property.

That the imposition of a license-tax of ten dollars per annum for the privilege of fishing in the waters of the state for profit is a reasonable tax we are satisfied. The food fishes caught in those waters have an annual value running into millions of dollars and furnish the means of livelihood to thousands of our citizens. Large sums are expended annually by the state to maintain the propagation of our food fishes, and to prevent the decrease of the supply. It is but fair that those who profit by these laudable and paternal efforts of the state should contribute something toward their cost, and this license-tax is, from the nature of the business, the only tax which can be imposed to aid in the protection of this important industry.

We think also that the imposition of this license has a tendency to protect the fish and prevent their extermination, and

the constitution expressly authorizes the legislature to "enact laws for the protection of fish." (Sec. 25½, art. IV.)

The writ is denied.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 13, 1914.