EX PARTE THOMAS POWELL.

Opinion filed Nov. 18, 1915.

Petition on rehearing denied Dec. 21, 1915.

1. Where general public interests are directly involved in an application for a writ of habeas corpus, the Supreme Court will within its discretion issue the writ that the State's interests may be conserved.

2. The provisions of Chapter 6877 Acts of 1915, requiring dealers in fish, and owners, &c., of boats used in fishing to procure a license and to pay a tax therefor, are germane to and properly connected with the subject of protecting and regulating the salt water fishing industry as expressed in the title of the act. Considered with reference to the body of the act, the title is not misleading.

3. After the United States acquired by treaty of cession from Spain the territory known as East and West Florida, such territory was held subject to the constitution and laws of the United States. The lands under navigable waters including the shores were held by the United States for the benefit of the whole people to go to the future State for the use of the whole people of the State.

4. The admission of the State of Florida "into the Union on equal footing with the original States, in all respects whatsoever" gave to the State of Florida all rights and powers as to property and sovereignty possessed by the original States of the Union, except such as were withheld by the act admitting the State.

5. The rights of the people of the States in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low water marks, relate to navigation, commerce, fishing, bathing, and other easements allowed by law. These rights are designed to promote the general welfare and are subject to lawful regulation by the States, and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, etc., and to the constitutional guaranties of private property rights.

6. Under the laws of this State, the public waters and the fish therein are held by the State for the benefit of the people of the State, subject to such regulations of the use thereof as the law-making power may provide.

7. The right of individuals to fish in the public waters of the State is subject to State regulation for the general welfare. This regulation may be of any character and to any extent that does not in effect destroy the right.

8. A legislative imposition of a license tax and other incidental regulations upon the persons who deal in fish and those who desire to fish, and upon boats used in fishing, is a proper exercise of the regulating sovereign police power of the State, and such power is limited only by the provisions of the State and Federal Constitutions.

9. Such of the provisions of Section 14, Chapter 6877, as require licenses to be taken out for the use of boats in fishing in the salt waters of the State, and making the license tax to depend upon the size of the boat, do not in effect constitute a "duty of tonnage" in violation of the Federal Constitution. The tax is not upon vessels or boats engaged in com-

merce to or from a port, but upon boats used in fishing in the waters of the State.

10. As the right of the people of the State to fish in the public waters of the State is subject to legislative regulation for the public welfare, lawful regulations do not deny "rights retained by the people" within the meaning of section 24 of the Declaration of Rights of the State Constitution.

11. The provisions of section 14, Chapter 6877, requiring the Shell Fish Commissioner to collect all license taxes under the act, does not violate the constitution.

12. The provision of section 22, Chapter 6877, Acts of 1915, that the State Comptroller shall issue a warrant drawn on the State Treasury to pay accounts, claims or bills approved by · the Shell Fish Commissioner, does not deprive the Comptroller of his constitutional right and duty to "examine, audit, adjust and settle the accounts of all officers of the State."

13. The policy, the wisdom and the economy of a statute are not judicial questions when the act does not violate organic law.

14. Where a petitioner claims a release on the ground that the statute under which he is held is unconstitutional, he will be remanded if the act is not invalid.

This is an original habeas corpus in this court.

Petitioner remanded.

*W. J. Oven* and *T. B. Ellis, Jr.,* for Petitioner.

*T. F. West,* Attorney General, for the State.

WHITFIELD, J.—Thomas Powell  presented to this court a petition for a writ of habeas corpus, in which petition it is alleged that Powell is detained in the custody of the Sheriff  of Levy County under  a commitment

which charges that Powell did, on October 1st, 1915, unlawfully engage in the business of a retail dealer in salt water fish, without having first paid the license tax required by Chapter 6877 of the laws of Florida, approved May 25th, 1915, and also that Powell on said date did unlawfully engage in the fishing industry in the salt waters of Florida, within a stated district by taking and catching fish from said waters from a certain boat more than 16 feet long without first procuring a police license from the Commissioner of Agriculture of Florida, as required by section 14 of Chapter 6877 of the Acts of 1915, approved May 25th, 1915, and without displaying the boat license number or license year tag as required thereby; that his detention is unlawful in that the statute, Chapter 6877 is contrary and repugnant to the Constitution of the Sate of Florida, in that the title is misleading and insufficient; that the act embraces more than one subject and matter properly connected therewith; that the Legislature is without authority to tax the people of the State for taking fish from the waters of the State; that it deprives persons of property and liberty without due process of law and lays a tonnage tax in violation of the Constitution of the United States; and in other particulars violates organic law.

In view of the general public interests involved a writ of *habeas corpus* was issued by this court. The Attorney General contends that the petitioner should be remanded because as he argues the return, stating that the petitioner is held as alleged is sufficient in that Section 14 of Chapter 6877, under which the petitioner is held, in so far as it affects the petitioner in this proceeding, does not offend organic law as alleged, and that if some other portions of the statute be unconstitutional, section 14 is not

thereby rendered invalid. See State *ex rel.* Clarkson v. Philips, Judge, this day decided.

The title and sections 1 and 14 of Chapter 6877, Acts of 1915, are as follows:

"An Act to Protect and Regulate the Salt Water Fishing Industry of the State of Florida, and to Provide Penalties for the Violation of this Act."

"Section 1. That all fish in the rivers, bayous, lagoons, lakes, bays, sounds and inlets bordering on or connected with the Gulf of Mexico and the Atlantic Ocean, or in the Gulf of Mexico or Atlantic Ocean, within the jurisdiction of the State of Florida, are hereby declared and shall continue and remain the property of the State of Florida, and may be taken and used by citizens of this State and persons not citizens of this State, subject to the restrictions and reservations hereinafter imposed by this Act."

"Sec. 14. No person, persons, firm or corporation, shall engage in the business of wholesale fish dealer until such person, persons, firm or corporation shall have first procured from the Commissioner of Agriculture of the State of Florida, an annual fish dealer's license for which a charge of ten dollars shall be made. All retail fish dealers shall pay a license tax of five dollars per annum. A wholesale fish dealer shall be considered any one who sells fish to a retail dealer other than the person who catches the fish, and a retail dealer shall be considered any one who sells fish directly to the consumer; Provided, however, that any one holding a merchandise license may sell salt cured fish without payment of such retail dealer's license.

Any and all boats or vessels engaged in the fishing industry in the salt waters of the State, before beginning

operations, must first procure a police license from the Commissioner of Agriculture, and for this purpose the owner, captain or agent of such vessel must present in writing to the said Commissioner of Agriculture an application setting forth the name and description of such vessel, name and postoffice of the owner, the number of nets carried by such boat, and any such further data as said Commissioner of Agriculture shall deem necessary, on blanks to be furnished by the Commissioner of Agriculture, and thereupon the Commissioner of Agriculture shall register such boat or vessel and shall issue necessary license on payment of cost thereof. All licenses shall be granted to the boat or vessel according to the following schedule:

Boats under 16 feet long and under 4 feet beam, $1.00; boats over 16 feet long and over 4 feet beam, 20 cents for each additional foot or fraction thereof of length or beam.

Provided, that any person paying the above license shall not be required to pay an additional license for fishing in any fresh water.

An additional license tax of ten dollars shall be required of all aliens or non-residents of the State of Florida on each boat or vessel engaged in the fishing industry in this State, operated in whole or in part by such alien or non-resident, in addition to the boat license tax required in this section. The failure of any alien or non-resident to secure such additional license, for such boats, before engaging in the fishing industry in this State will be considered a violation of this Act.

Whoever being an alien or non-resident of this State, and who shall engage in taking fish or oysters from the salt waters of this State for any purpose other than his

own individual use, shall be required to pay a license tax of ten dollars per annum. Such alien or non-resident shall make application to the Commissioner of Agriculture, over his own signature, for such license on blanks furnished by the Commissioner of Agriculture, which shall set forth the nationality of such alien or non-resident, local address and such other information as may be required by the Commissioner of Agriculture.

The said Commissioner of Agriculture shall give to each licensed vessel or boat a license number, and the owner of such boat or vessel shall at once cause to be painted on each side of the bow of such boat or vessel, in figures at least six inches long and proportionate width, in a color distinct and different from the body color of the hull, and shall also display said number on the peak of the mainsail of such vessel, if the same be a sailing craft, and each figure on said sail shall be at least twelve inches long, of proportionate width, and four inches apart.

The Commissioner of Agriculture shall give to each licensed vessel or boat at actual cost a metal tag, on which shall be printed the license year for which the same is issued. Such metal tag to be prominently displayed on such boat or vessel.

Payment of this police license and the compliance with the provisions and regulations shall be required of any and all vessels and boats engaged in fishing or freighting fish or otherwise engaged in the fish industry, and all such license tax shall be collected by the Shell Fish Commissioner or his duly authorized deputies.

Every boat or vessel shall be entitled to carry and fish one net and every additional net carried by any boat or vessel, in excess of one net, the owner of such boat or vessel shall be required to pay a license tax on such ex-

24

cess net of $1.00 per annum, and such excess net shall have attached to the cork line a metal license tag, provided for that purpose, bearing the number of such excess license. The use of pound nets shall be unlawful in the salt waters of the State of Florida.

All license taxes shall be collected by the Shell Fish Commissioner or a duly authorized deputy, and deposited in some bank designated by the Commissioner of Agriculture, until the end of each month, at which time a check shall be drawn against such deposit by the Commissioner of Agriculture in favor of the State Treasurer, who will place same to the credit of the Shell Fish Fund. A monthly report shall be made to the Governor of such report and deposit, setting forth the various sources from which such revenues are derived, and a copy of such report shall be delivered to the State Treasurer with such remittance.

At the end of each calendar month all moneys in the Shell Fish Fund in excess of $10,000 shall be transferred by the State Treasurer from the Shell Fish Fund to the General Fund in the State Treasury and the State Treasurer shall notify the Commissioner of Agriculture of the transfer of such excess funds.

The licenses provided by this section being police licenses exacted by the State in the control of her own property, over which a police control is necessary, no county, city, town or municipality shall impose any further license tax than herein provided. This provision does not, however, prevent State, County and Municipal tax on personalty and realty as now provided by law.

The payment of a license tax, or the procuring of any license shall not be required of persons fishing only with hook and line or with rod and reel or similar device."

It is argued that the imposition of a license tax upon residents of the State for the privilege of fishing in the salt waters of the State, and for dealing in salt water fish, is not included in the subject expressed in the title of the act, and is not a matter properly connected therewith, within the meaning of Section 16 of Article III of the Constitution; and further that if so included, such imposition of license taxes is invalid because under the Spanish law, which should be the law in this State, the right to fish in the public waters of the State belongs to the people of the State and cannot lawfully be restricted by license tax exactions.  It seems evident that imposing license taxes for fishing in the salt waters of the State, and for dealing in salt water fish is germane to and properly connected with the subject of protecting and regulating the salt water fishing industry as expressed in the title of the act.  The imposition of a license upon dealers in salt water fish may be expedient to make effective the regulations for the protection of fish.  The  occupation of a dealer is peculiarly subject to license taxes, and whether the license tax imposed by this act upon dealers in fish is cumulative with a prior act which also exacts a license from dealers in fish generally, does not go to the validity of the later act, no question of repugnancy or repeal being presented.  The title of the act is not misleading, and it does not beyond a reasonable doubt violate organic law. The validity of the tax should therefore be considered.

By treaty of February 22, 1819, the  Kingdom of Spain ceded "to the United States, in full property and sovereignty, all the territories * * * known by the name of East and West Florida," with an expressed provision that all the grants of land made by Spain before January 24, 1818, in said territories shall be ratified and con-

firmed to the persons in possession of the lands. Articles 2 and 8 of Treaty to be found in Fuller's Purchase of Florida, pages 372-374.

After the United States acquired by treaty of cession from Spain the territory known as East and West Florida, such territory was held subject to the constitution and laws of the United States. The lands under navigable waters including the shores were held by the United States for the benefit of the whole people to go to the future State for the use of the whole people of the State.

The Constitution of the United States provides that "new States may be admitted by Congress into this Union." The territory known as East and West Florida ceded by Spain to the United States was by Act of Congress approved March 3, 1845, under the name of the State of Florida, "admitted into the Union on equal footing with the original States, in all respects whatsoever," "on the express condition that (the State) shall never interfere with the primary disposal of the public lands lying within" it.

The admission of the State of Florida "into the Union on equal footing with the original States, in all respects whatsoever" gave to the State of Florida all rights and powers as to property and sovereignty possessed by the original States of the Union, except such as were withheld by the act admitting the State.

Among the rights thus acquired by the State of Florida is the right to own and hold the lands under navigable waters within the State including the shores or space between ordinary high and low water marks, for the benefit of the people of the State, as such right is as essential to the sovereignty, to the complete exercise of police powers and to the welfare of the people of the new States as

of the original States of the Union. Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; Mobile Dry Docks Co. v. Mobile, 146 Ala. 198, 40 South. Rep. 205, 9 Am. & Eng. Anno. Cas. 1299; State v. Gerbing, 56 Fla 603, 47 South. Rep. 353.

Under the common law of England, the crown in its sovereign capacity held the title to the beds of navigable or tide waters, including the shore or the space between high and low water marks, in trust for the people of the realm, who had rights of navigation, commerce, fishing, bathing, and other easements allowed by law in the waters. This rule of the common law was applicable in the English colonies of America. After the Revolution resulting in the independence of the American States, title to the beds of all waters, navigable in fact, whether tide or fresh, was held by the States in which they were located, in trust for all the people of the States respectively. When the Constitution of the United States became operative, the several States continued to hold the title to the beds of waters within respective borders that were navigable in fact without reference to the tides of the sea, not for purposes of disposition to individual ownerships, but such title was held in trust for all the people of the States respectively, for the uses afforded by the waters as allowed by the express or implied provisions of law, subject to the rights surrendered by the States under the Federal Constitution. The rights of the people of the States in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low water marks, relate to navigation, commerce, fishing, bathing and other easements allowed by law. These rights are designed to promote the general welfare and are subject to lawful regulation by the

States, and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, etc., and to the constitutional guaranties of private property rights. The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the States. For the purpose of enhancing the rights and interests of the whole people, the States may by appropriate means grant to individuals the title to limited portions of the lands under navigable waters, or may give limited privileges therein, but not so as to divert them from their proper uses for the public welfare, or so as to. relieve the States respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress. New States, including Florida, admitted "into the Union on equal footing with the original States, in all respects whatsoever," have the same rights, prerogatives, and duties with respect to the navigable waters and the lands thereunder within their borders as have the original thirteen States of the American Union. Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826.

Under the civil law of Spain all those owing allegiance to the Crown were equally entitled to the right to fish in the public waters of the Kingdom. Such rights were denominated *res communes,* and considered as *res omnium,* in respect to their use and benefit, but in respect to property as *res nullius.* . By the common law, the waters of the sea and the shores of the same are as much subject to public use as they are by the civil law, but the essential difference between the two is in the above stated doctrine of the civilians, that such waters are the property of no one; but the policy of the common law, on the

contrary, was to assign to everything capable of occupancy and susceptible of ownership a legal and certain proprietor, and accordingly it makes those things which from their nature can not be exclusively occupied and enjoyed, the property of the sovereign. Sullivan v. Richardson, 33 Fla. 1, 14 South. Rep. 692.

Conceding, as is argued, that the Civil law of Spain provided that the public waters of the Kingdom were "common to all the inhabitants thereof, present and to come; and that they may freely enjoy the use of them," White's Spanish Laws, page 44, yet the free enjoyment of the use of the right was subject to governmental regulation for the good of the whole public. The burden of the regulations may be sustained by license, taxes or otherwise. This must certainly have been true under a monarchy, if it is true under a republican government like the United States and the several States of the Union. The cession by Spain to the United States of the territory now constituting the State of Florida involved no reservation to persons collectively or severally of fishing rights in the public waters of the territory covered by the cession, and the land and all of its accessories and the people living within the territory ceded became subject to the laws of the United States upon the cession.

Under the American Law the United States held the public waters and the fish therein for the benefit of the people, and such holding was by law transferred to the State upon its admission into the Union, subject to the powers granted to the United States as to interstate commerce, navigation, etc., under the Federal Constitution and the holding by the new State was the same as that of the original 13 States. See State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353; Lawton v. Steele, 119

N. Y. 226, 23 N. E. Rep. 878, 7 L. R. A. 134; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; Skinner v. Hettrick, 73 N. C. 53; Ex parte Crosby,    Nev.    , 149, Pac. Rep. 989.

Section 1 of Chapter 6877 recognizes the rights of the people of the State to take and use the fish in the public waters of the State, and the reference in the section to the property of the State in such fish is not in conflict with the expressly recognized public rights or privileges of the people.

Under the laws of this State, the public waters and the fish therein are held by the State for the benefit of the people of the State, subject to such regulation of the use thereof as the law making power may provide. The right of individuals to fish in the public waters of the State is subject to State regulation for the general welfare. This regulation may be of any character and to any extent that does not in effect destroy the right. A legislative imposition of a license tax and other incidental regulations upon the persons who deal in fish and those who desire to fish and upon boats used in fishing, is a proper exercise of the regulating sovereign police power of the State, and such power is limited only by the provisions of the State and Federal Constitutions. See Ex Parte Para,    Cal. App.    , 141 Pac. Rep. 393.

The act does not impair vested rights in so far as it imposes licenses and license taxes and other regulations as a prerequisite to dealing in fish taken from the public waters of the State, or as a prerequisite to fishing in boats; and appropriate classifications are incident to regulation and are lawful when not so arbitrary and oppressive as to violate organic law. See State ex rel. Clarkson v. Philips, Judge, filed this day. The statute

does not purport to regulate or to deny to any one the right to labor as in Truax v. Raich, 239 U. S. 33,    Sup. Ct. Rep.    , Nov. 1st, 1915.                :

The fact that license or other regulations have not heretofore been enacted, does not affect the power or the duty of the State to act for the public good.   On its face the statute does not indubitably deprive any person of property rights or liberty without due process of law, nor deny to any one the equal protection of the laws.

Such of the provisions of section 14 Chapter 6877 as require licenses to be taken out for the use of boats in fishing in the salt waters of the State, and making the license tax to depend upon the size of the boat, do not in effect constitute a "duty of tonnage" in violation of the Federal Constitution.   The tax is not upon vessels or boats engaged in commerce to or from a port, but upon boats used in fishing in the waters of the State. See State v. Corson, 67 N. J. L. 178, 50 Atl. Rep. 780; The Queen, 124 C. C. A. 214, 206 Fed. Rep. 148; Huse v. Glover, 119, U. S. 543, text 549, 7 Sup. Ct. Rep. 313, text 316. In 94 U. S. 238 and 133 Fed. 188, the tax was on commerce levied upon every steam boat or vessel entering the port, or loading or unloading at a wharf in the port.

As the right of the people of the State to fish in the public waters of the State is subject to legislative regulation for the public welfare, lawful regulations do not deny "rights retained by the people" within the meaning of section 24 of the Declaration of Rights of the State Constitution. See City of Jacksonville v. Bowden, 67 Fla. 181, 64 South. Rep. 769.

The provisions of Section 14 requiring the Shell Fish Commissioner to collect all license taxes under the act, does not violate the Constitution.   County tax collectors

are constitutional officers, but their duties are only such as "shall be prescribed by law."   Sec. 6. Art. VIII.

Section 22 provides that the State Comptroller shall issue a warrant drawn on the State Treasury to pay accounts, claims or bills approved by the Shell Fish Commissioner but this does not deprive the Comptroller of his constitutional right and duty to "examine, audit, adjust and settle the accounts of all officers of the State." Sec. 23 Art IV.

The policy, the wisdom and the economy of the statute are not judicial questions when the act does not violate organic law.

It has not been made to appear that the statute under which the petitioner is held in custody is undoubtedly violative of organic law, therefore the petitioner will be remanded.

TAYLOR, C. J., and COCKRELL and ELLIS, JJ., concur.

SHACKLEFORD, J., absent on account of illness.