STATE ex rel. MARSH, et al v. SIMBERG, et al (No.2).

Circuit Court, Dade County.

July 31, 1953.

R. K. Bell, C. Frederic Brown and David Koller, all of Miami, for plaintiffs State ex rel. David Koller, David Koller individually, and Citizens League of Miami Beach.

John D. Marsh, County Solicitor, Dade County, relator.

Ben Shepard, City Attorney, Miami Beach, for City of Miami Beach and its councilmen.

CHARLES A. CARROLL, Circuit Judge.

Under an order of severance dated October 15, 1952 [reported in 2 Fla. Supp. at page 197] this trial involved a *separate* cause of action—in which the plaintiffs, as substituted are State of Florida, ex rel. John D. Marsh, County Solicitor, and ex rel. David Koller, and David Koller, individually, and Citizens League of Miami Beach, a corporation of Florida, not for profit.

There have been some recent changes in the personnel of the defendant city council, and it is ordered and decreed that Harold Shapiro and Harold B. Spaet be substituted as defendant members of the Miami Beach city council for William Burbridge and Melvin J. Richard, who have become separated from their offices.

Plaintiffs' bill alleges sovereign ownership—in trust for the public—of the foreshore, including the land between the ordinary high and low tide water marks on the Atlantic Ocean, that the city has established what it calls a harbor line and has permitted bulk-heading and filling in and construction out to such harbor line, that this harbor line generally lies eastward of the land between ordinary high and low water marks, that the city has done this by passing ordinances under certain presumed charter authority—and that the effect has been to confer such sovereign rights on riparian owners and to exclude the public from the use and enjoyment thereof.

The city's answer admits that such action was taken under the ordinances and charter provision to which plaintiffs referred but denies that the land between the high and low water marks on the Atlantic Ocean is owned by the state in trust for the public, taking the position that the beach is west of where it formerly was because of certain storms, particularly the 1926 hurricane, and that its establishment of a harbor line in 1948 was for the purpose of allowing riparian owners to build out to reclaim what they lost in the 1926 and later storms.

Upon consideration of the pleadings, the testimony and evidence adduced at the trial, the arguments of counsel and briefs or memoranda of law, it is found, declared, ordered, adjudged and decreed as follows—

The charter provision involved is subsection (f) of section 6 of chapter 13101, Special Acts of 1927. That Act was one which amended certain sections of the original charter (chapter 7672)—including section 6 relating to powers of the city. The 1927 Act, enlarging and restating the powers of the city, included the provision about fixing a harbor line. The title of this 1927 Special Act, and the provision or part thereof in question, are as follows—

## CHAPTER 13101

AN ACT to Amend Sections 6, 29, 30 and 37 of Chapter 7672 of the Laws of Florida Relating to the Municipal Government of the City of Miami Beach, Florida.

BE IT Enacted by the Legislature of the State of Florida:

Section 1. That Section 6 of Chapter 7672 of the Laws of Florida be and the same is hereby amended to read as follows:

"Section 6. That said City of Miami Beach shall have power:

\* \* \*

"(f) To establish a harbor line in the Atlantic Ocean and to control and prohibit the use of submerged land East thereof except for boating, fishing and bathing and to provide life guards for safety purposes."

That was in 1927. In 1948, three ordinances were passed by the city council—no. 832, dated February 4, 1948, no. 856, dated July 7, 1948, and no. 861, dated September 1, 1948. They are alike in form, differing only in the description and portions of the beach each covers. The first one reads as follows—

### ORDINANCE NO. 832

AN ORDINANCE OF THE CITY OF MIAMI BEACH, FLORIDA, ESTABLISHING A HARBOR LINE IN THE ATLANTIC OCEAN; DESIGNATING THE LOCATION OF BULKHEADS; PROVIDING THAT NO MATERIAL SHALL BE EXCAVATED FROM THE AT-LANTIC OCEAN FOR THE PURPOSE OF BACKFILLING ANY BULKHEAD; LIMITING THE EXTENT OF GROYNES; PROVID-ING THAT NO BULKHEAD SHALL BE CONSTRUCTED UNTIL THE ADJACENT GROYNES HAVE BEEN COMPLETED; AND PROVIDING PENALTIES FOR THE VIOLATION OF THIS ORDINANCE.

BE IT ORDERED BY THE CITY COUNCIL OF THE CITY OF MIAMI BEACH, FLORIDA:

*Section* 1: A harbor line is hereby established in the Atlantic Ocean between a line seven (7) feet southerly of the southerly line of 22nd Street extended easterly and the northerly line of 33rd Street extended easterly, located as follows:

[A lengthy description of the portion of the beach or shore line affected by this ordinance is omitted at this point in the interest of brevity.]

*Section* 2: That no bulkhead or other structure, except groynes, shall be constructed or created which shall be easterly of the line described in Section 1.

*Section* 3: That no material shall be excavated from the Atlantic Ocean for the purpose of backfilling behind any bulkhead.

*Section* 4: That no groynes shall be constructed or erected which shall extend into the ocean a distance of more than 200 feet from the harbor line described in Section 1 of this ordinance.

*Section* 5: [Deleted—Amendment Ordinance No. 853.]

*Section* 6: Any person convicted of the violation of any of the provisions of this Ordinance shall, upon conviction be fined not exceeding $500.00 or be imprisoned in the City Jail not exceeding sixty (60) days, or by both such fine and imprisonment, in the discretion of the Municipal Judge. Each day that a violation is permitted to exist shall constitute a separate offense.

PASSED and ADOPTED this 4th day of February, A. D. 1948.
ATTEST:

C. W. Tomlinson                          Marcie Liberman
    *City Clerk*                                *Mayor*
(SEAL)

The facts are that proceeding under these ordinances, which affect a substantial part of the oceanfront in the city, a line has been fixed on or east of the foreshore consisting of beach between high and low water marks, and riparian owners have been granted permits to erect bulkheads and fill in and erect structures out to such line. This has resulted and in most such instances will result in the upland owner taking over the beach or foreshore, and using same for private use and benefit, such as incident to operation of a hotel by the upland owner or his lessee. The photographic exhibits in the case show this very graphically. The result is exclusion of the public from such portion of the beach between high and low water marks.

I find that the harbor line was set by the engineering office of the city without any plan or regard for such elements as beach bathing or recreation, fishing, boating or navigation, but only as a "bulkhead line," to mark the point in or toward the ocean to which upland owners could be permitted to extend their control and private use.

I find further that the harbor line is for the most part an arbitrary line, supported mostly by assumption and estimate. Earlier surveys which were relied on as showing location of the shore line at prior dates were not adequate to support this harbor line. Their showing of the shore line was incidental. They did not purport to show it exactly, but were for other purposes. The original points are questionable, and there were gaps of shoreline with no prior showing. The harbor line itself does not attempt to follow exactly or minutely the prior engineering data which was available, but is drawn on a straight line gentle curve basis, which emphasizes the idea that it was a line of estimate and convenience.

I find that there has been a recession of the beach line to some extent over the past twenty or thirty years. Undoubtedly the hurricanes in 1926 and other years had something to do with that. But

the city engineer, who testified for days in this case, said repeatedly during the first day of his testimony that it was erosion due to many and varied causes which had changed the shore line. His testimony shows the action of the city (contrary to its answer) was not on the basis of the beach being changed by avulsion overnight in the 1926 hurricane, but that a change in the beach over the years by erosive forces of various character was observed by him.

But if there was at any time a visible loss by avulsion, as distinguished from erosion, it is clear that the instances where the city has permitted upland owners to take over the foreshore were not predicated on any factual showing and findings in that regard.

In the absence of an enabling statute, an upland or riparian owner cannot appropriate the state-owned lands between ordinary high and low tide water marks. There is no need to cite the multiple decisions on this over the last hundred years. An example is a statement from the opinion in White v. Hughes (Fla.), 190 So. 446, 449-450, as follows—

> The beach of the Atlantic Ocean between high and low water marks is the property of the state, held in trust for the use of all the people of the state. Ferry Pass Inspectors, etc., Ass'n. v. White River Inspectors, etc., Ass'n., 57 Fla. 399, 48 So. 643, 22 L.R.A., N.S., 345; Deering v. Martin, 95 Fla. 224, 116 So. 54; Brickell v. Trammell, 77 Fla. 544, 82 So. 221; Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 So. 428; Symmes v. Prairie Pebble Phosphate Co., 64 Fla. 480, 60 So. 223; Ex parte Powell, 70 Fla. 363, 70 So. 392; Thiesen v. Gulf, F.&A.R.Co., 75 Fla. 28, 78 So. 491, L.R.A. 1918E, 718; State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 So. 353, 22 L.R.A., N.S., 337; Pembroke v. Peninsular Terminal Co., 108 Fla. 46, 146 So. 249; State ex rel. Landis v. Rosenthal, 109 Fla. 363, 148 So. 769.

Consistent with this trust, the state through legislation can authorize uses by individuals or the public for purposes other than the primary uses of boating, fishing, swimming and recreation, when (1) there is a sufficient overall public benefit derived thereby, and (2) when the public's use thereof for the primary purposes is not eliminated or unduly withheld. The following is from Adams v. Elliott (Fla.), 174 So. 731 at page 734—

> While the foreshore or beach on the ocean is held by the sovereign in trust for the public primarily for purposes of navigation, commerce, fishing, and bathing, such beach or foreshore is also held in trust for other purposes authorized by law when the first mentioned primary purposes are not excluded or unduly abridged or burdened. Therefore the above statute authorizing the use of the beach for highway purposes "subject to the paramount right of the public to use the [beach] for bathing and recreation," and subject to governmental regulation, is a valid exercise of the sovereign power of the state in the premises.

The following is from Brickell v. Trammell (Fla.), 82 So. 221 at page 226—

The rights of the people of the states in the navigable waters and the lands thereunder, including the shore or space between ordinary high and low water marks, relate to navigation, commerce, fishing, bathing, and other easements allowed by law. These rights are designed to promote the general welfare and are subject to lawful regulation by the states, and such regulation is subordinate to the powers of Congress as to interstate commerce, navigation, post roads, etc., and to the constitutional guaranties of private property rights.

The trust in which the title to the lands under navigable waters is held is governmental in its nature and cannot be wholly alienated by the states. For the purpose of enhancing the rights and interests of the whole people, the states may by appropriate means grant to individuals limited privileges in the lands under navigable waters, but not so as to divert them or the waters thereon from their proper uses for the public welfare, or so as to relieve the states respectively of the control and regulation of the uses afforded by the land and the waters, or so as to interfere with the lawful authority of Congress. See 62 Fla. 549, 57 South. 428; Clement v. Watson, 63 Fla. 109, 58 South. 25, Ann. Cas. 1914A, 72.

While it dealt with navigable streams, rather than the ocean shore, (the principles being applicable to each), Ferry Pass I. & S. Ass'n. v. White's River I. & S. Ass'n., 48 So. 643, at 644-645, explained the status and rights of a riparian owner in this connection. That case also stated the proposition that a riparian owner, aside from any statute, may use the state's trust lands of shore and water for commerce and in connection with the conduct by him of his business, but only in recognition of and subject to the rights therein of the public. On that point the court said at page 645—

As to mere navigation in and commerce upon the public waters, riparian owners as such have no rights superior to other inhabitants of the state. A riparian owner may use the navigable waters and the lands thereunder opposite his land for purposes of navigation and of conducting commerce or business thereon, but such right is only concurrent with that of other inhabitants of the state, and must be exercised subject to the rights of others. See 1 Farnham on Waters, p. 131 et seq. The right of access to the waters from the riparian lands may in general be exclusive in the owner of such lands, but as to the use of the navigable waters and the lands thereunder, including the shore, the rights of riparian owners and of others of the public are concurrent, and subject to applicable rules of law.

Until this Miami Beach situation occurred, there does not seem to have been any serious challenge, by any subdivision or agency of the state, of the established law that the public's rights to use the shores of the ocean between high and low tide lines are paramount and superior to a claim of an individual riparian owner to appropriate such state-owned beach lands to his own personal use.

The right of public officials, and of individuals, to prevent persons from depriving the public of such rights or unduly interfering therewith, has been recognized repeatedly. One statement of that appears in the Ferry Pass case, supra, 48 So. at page 645, as follows—

> Subject to the superior rights of the public as to navigation and commerce, and to the concurrent rights of the public as to fishing and bathing and the like, a riparian owner may erect upon the bed and shores adjacent to his riparian holdings bath houses, wharves, or other structures to facilitate his business or pleasure; but these privileges are subject to the rights of the public to be enforced by proper public authority or by individuals who are specially and unlawfully injured.

In conformity to the above, where statutes have conferred rights upon individuals in such sovereign trust lands, they have (1) been clear and positive, (2) stated the benefit accruing to the whole people which is a prerequisite, (3) reserved the rights of the public, and (4) conferred only easements or conditioned and not absolute title.

An example is the Riparian Act. First passed in 1856, its early title was quoted in Ruge v. Apalachicola Oyster Canning & Fish Co., 6 So. 489, at page 492 as "An Act to benefit commerce" with a preamble reading—" 'Whereas, it is for the benefit of commerce that wharves be built and warehouses erected for facilitating the landing and storage of goods; and whereas, the state being the proprietor of all submerged lands and water privileges within its boundaries, which prevent the riparian owners from improving their water-lots, therefore,' etc."

The Riparian Act now appears as chapter 271, Florida Statutes 1951. It does not apply on the ocean shore, but to navigable bays and streams. It allows owners to bulkhead and fill in out to the channel and erect wharves, docks, etc.

It is noted, however, that the Act starts out with a recognition of the trust ownership of the state, saying—"The State of Florida, subject to any inalienable trust under which the state holds all submerged lands and water privileges within its boundaries, divests itself," etc. Section 271.01.

Further, in the same section, where it speaks of conferring legal title to such filled in extension, it says it vests title (in the riparian owner) "subject to said trust," and that the fill and structures shall leave "full space for the requirements of commerce."

Even that statute does not authorize a riparian owner to build out over the shore or fill in submerged waters on a bathing beach. Section 271.07 reads as follows—"*Chapter not applicable to bathing beaches.*—Nothing in this chapter shall be construed to apply to beaches customarily used by the public as bathing beaches."

Another example is a statute allowing designation of a beach as a public highway. Where such statutes apply, it is held that the rights of the public to use the beaches for bathing and recreation are superior.

Adams v. Elliott, supra, 174 So. 731, 734, shows that the statute which made the beach in Duval County a highway, in conferring the right said—"but subject to the paramount right of the public to use the same for bathing and recreation." In White v. Hughes, supra, 190 So. 446, the court said at page 450—

> The primary uses of most of the beaches have always been bathing, recreation, fishing and navigation. Adams v. Elliott, supra; Sallas v. State, supra. These primary uses are subject to lawful regulation by the sovereign state in the interest of the public, and subject to the authority of Congress as to commerce and navigation. The Sovereign state may in the interest of the general welfare authorize the beach or shore to be appropriately used as a public highway. And most of our Florida beaches, when the tide is out, afford marvelously perfect highways, which are obliterated and re-built twice each day by the unseen hand of the Almighty. However, we are of the opinion that such an authorization for highway uses must be subject to a reasonable use of the beach or shore for its primary and long established public purposes, for which the State holds it in trust, and subject to lawful governmental regulations.

> For the above reasons we hold that the right of the public to use the beach for bathing and recreational purposes is superior to that of the motorists driving automobiles thereon.

In White v. Hughes, supra, the court discussed the value to the public of the bathing and recreational facilities of the beaches of this state. The right of the public to use the state-owned beaches for their primary and ordained purposes is more real and important in Florida than elsewhere. The comments on this point in White v. Hughes, 190 So. at 448-449, were these—

> There is probably no custom more universal, more natural or more ancient, on the sea-coasts, not only of the United States, but of the world, than that of bathing in the salt waters of the ocean and the enjoyment of the wholesome recreation incident thereto. The lure of the ocean is universal; to battle with its refreshing breakers a delight. Many are they who have felt the lifegiving touch of its healing waters and its clear dust-free air. Appearing constantly to change, it remains ever essentially the same. This primeval quality appeals to us. "Changeless save to thy wild waves play, time writes no wrinkles on thine azure brow; such as creation's dawn beheld, thou rollest now." The attraction of the ocean for mankind is as enduring as its own changelessness. The people of Florida—a State blessed with probably the finest bathing beaches in the world—are no exception to the rule. Skill in the art of swimming is common amongst us. We love the oceans which surround our State. We, and our visitors too, enjoy bathing in their refreshing waters. The constant enjoyment of this privilege of

thus using the ocean and its fore-shore for ages without dispute should prove sufficient to establish it as an American common law right, similar to that of fishing in the sea, even if this right had not come down to us as a part of the English common law, which it undoubtedly has. See Brickell v. Trammell, 77 Fla. 544, 82 So. 221. Private ownership stops at high-water mark. The State holds the fore-shore in trust for its people for the purposes of navigation, fishing and bathing. It is difficult indeed to imagine a general and public right of fishing in the sea, and from the shore, unaccompanied by a general right to bathe there, and of access thereto over the fore-shore for that purpose. Universal and habitual practice in England and America for many years has established this right, and it is also recognized by a statute which we will presently quote. Small inland streams and lakes, which are not navigable and not subject to the tides, may under certain circumstances become private property to all intents and purposes. But not so the sea, or its shore.

The writer of that opinion was the late Mr. Justice Armstead Brown, from Dade County. No doubt he reflected upon the local beaches with which this case is concerned.

Before testing the parties' contentions against these established principles, it must be noted that the position taken by the defendant city of Miami Beach is not entirely clear. The city contends that the charter provision for the fixing of the harbor line amounted to a statutory grant of power to the city, upon placing such line out in the ocean, to permit the shore and submerged land (out to such line) to become the property of riparian owners, absolutely and with no reservation to the public or otherwise. But the city also contends it has not affected any state-owned land, because (it says) that some twenty-five or thirty years ago the high water mark was further east, and the present beach is, therefore, not the beach, and not owned by the state. The two contentions are inconsistent.

Looking first at the city charter provision relied on, the answer to that contention is apparent.

In the first place, the provision to fix a harbor line does not at all say that it divests the state of title to the beaches, nor does it purport to express any grant of power to the city to do so.

Secondly, if the statute had contained language to grant the title to the city, or to enable the city to divest the state's title or terminate the state's inalienable trust ownership of such lands, the statute would have to be rejected as in conflict with section 16 of article 3 of the Florida constitution regarding subjects and titles of legislative enactments. The only caption or title of that Act is that it is an amendment of certain numbered sections of a prior Act. If a new provision contained such a drastic item as is contended for it

here, then the title should have been such as to denote the contents. The recent case of Bird Key Corp. v. City of Sarasota (Fla.), 54 So. 2d 245, is squarely in point on that. See, also, State ex rel. Landis v. Rosenthal (Fla.), 148 So. 769, 771, and Perky Properties, Inc. v. Felton (Fla.), 151 So. 892, 895.

Thirdly, it was held in Perky Properties, Inc. v. Felton, supra, that a statute which purported to grant to private ownership exclusive right or title to sovereign lands held in trust for the public, without due reservation to the public, would not be effective. So even if the city charter either granted or could be construed to grant or take away title of the state to the beach, it would not be valid in such bald and absolute form. The following is from page 895 of the Perky Properties case—

> The tidal and submerged lands of the state and the uses thereof are held in trust for all the people of the state; and, while private rights in the uses of limited portions of such lands may be granted by the Legislature upon proper terms, reservations, and considerations when the public welfare will thereby be promoted, State v. Gerbing, 56 Fla. 603, 47 So. 353, 22 L.R.A. (N.S.) 337, yet legislative grants to private ownership of the exclusive rights and privilege to grow and gather sponges upon large areas of tidal submerged lands of the state, with the right to inclose such areas and to close the inlets thereto, without reservation, compensation, or consideration, is not contemplated by the public nature and purposes of the title of the state to such lands which was acquired as a sovereign right upon the admission of Florida in the Union as a sovereign state.

But this charter provision would not get that far. It should not be construed as intending the fixing of a "bulkhead" line, for the purpose of allowing a riparian owner to build out and exercise exclusive control to such "bulkhead" line.

In view of the law relating to beaches, and the respective rights of public and riparian owners, if it is to be given a meaning of authorizing a "bulkhead" and building line, then it should be construed as authorizing the fixing of the same at and along the ordinary high water line.

The fact that it said the harbor line was to be fixed in the ocean shows it did not mean any bulkhead line, and whatever the purpose was as to the important area west of the harbor line, the statute is silent about it.

It is the ruling of this court that the charter provision in question did not authorize the city to permit riparian owners to construct bulkheads or structures below or east of the ordinary high water line of the ocean.

It follows that the said three ordinances are ineffective to accomplish that result and shall not be used or construed to authorize building (except groynes) on or across the foreshore, by any upland or riparian owner or anyone claiming under any such owner.

The city's contention that because of change in the shore location it can authorize an owner to build across the beach and exclude the public by erecting bulkheads, walls and structures which extend to or into the ocean at low tide, is not supportable on this record.

Underlying this case there is a basic conflict between the public (or state), on the one hand, to preserve to the public, for exercise of its paramount uses for bathing and recreation, the beach areas held in trust by the state for that purpose, and, on the other hand, the effort of riparian owners to take over the state-owned portion of the beaches for their private exclusive use in the operation of their hotel or housing businesses.

A statement of this problem and of the legal limits and safeguards applicable is set out in the case of Merrill-Stevens Co. v. Durkee (Fla.), 57 So. 428, 431, as follows—

> The state may, in the interest of the public welfare, grant limited rights in portions of the lands under navigable waters within its borders, or may permit the use thereof, when the rights of the whole people of the state as to navigation and other uses of the waters are not materially impaired. The rights of the people of the state in the navigable waters and the lands thereunder, including the shores or spaces between ordinary high and low water marks, are designed for the public welfare, and the state may regulate such rights and the uses of the waters and the lands thereunder for the benefit of the whole people of the state as circumstances may demand, subject of course to the powers of Congress in the premises. For the purpose of aiding navigation or commerce, or of encouraging new industries and the development of natural or artificial resources in the interest of all the people, the state may grant reasonable and limited rights and privileges to individuals in the use of lands under navigable waters in the state; but such privileges should not unreasonably impair the rights of the whole people of the state in the use of the waters or the lands thereunder for the purposes implied by law, nor relieve the state of the control and regulation of the uses afforded by the lands and the waters thereon. The state may fix the exterior lines of a navigable river if the rights of the people to the use of the waters and the shores of the river are not thereby substantially impaired; and rights in the submerged lands not within the reasonably fixed exterior lines of the river may be granted by legislative authority if such grant does not impair the rights of the whole people to the use of the waters for any purpose expressed or implied by law. State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. 353, 22 L.R.A. (N.S.) 337; Ferry Pass Inspectors' & Shippers' Ass'n. v. White River Inspectors' & Shippers' Ass'n., 57 Fla. 399, 48 South. 643, 22 L.R.A. (N.S.) 345.

Tested against the above, it has not been shown that an individual's operation of a hotel or apartment adjacent to the foreshore constitutes a benefit to the whole people such as could justify surrender by the public of that portion of the state-owned beach to that individual. When that happens, the public is excluded from use of the foreshore, losing a paramount right, while the landowner benefits. That does not represent inconveniencing the public to encourage new industries, or for the development of natural resources or other commerce, in the interest of all the people. It puts the lands in the hands of an individual, out of control of the state (which is charged with retaining and exercising control), and without any due reservation for the public, and clearly not without seriously hindering the public in the enjoyment of its intended primary uses of such lands.

Whereupon, the preliminary injunction which was previously entered in this cause is made permanent as follows—

That the defendant city of Miami Beach, its councilmen, agents, employees and attorneys be and they and each of them are enjoined and restrained from granting to any upland or riparian owner of property along the Atlantic Ocean or to any other person, a permit or authority to construct a sea wall, bulkhead, fill or other structure, on or across the foreshore of the Atlantic Ocean as the same exists and is located today and as the same shall exist and be located from day to day, being that area lying east of the existing high water mark of the Atlantic Ocean.

Inasmuch as such construction, of the character which is enjoined in the preceding paragraph, previously was permitted by the city only upon permit and thus was controlled by the city through the device of building permits, this injunction against the city's granting or continuing to grant such permits shall be construed to be an order that the city shall control such construction and not permit the same either by the granting of permits or without its permits.

Power of the city to fix a harbor line in the Atlantic Ocean is recognized for purposes for which such a harbor line may be proper or useful, but no such harbor line lying east of the high water mark shall be any reason or basis for allowing or permitting riparian owners or other persons to build on or control the foreshore contrary to the injunction contained in this decree.

An exception to this injunction shall be that it shall not extend or apply to construction of groynes or jetties built at right angles to the beach, in an east-west direction, the object and purpose of

which are to preserve an existing beach, to trap the sand and to improve or enlarge the beach, but the authority to grant permits for the erection of such groynes shall not include authorizing or permitting erection of fences or walls across the foreshore or out into the ocean the object or effect of which is to obstruct and prevent passage of the public along the foreshore portion of the beach.

The injunction bond filed in connection with the preliminary injunction is hereby cancelled, and the principal and surety on said bond are hereby released from further liability thereon.

Jurisdiction is reserved to make such other and further orders herein as may be necessary and proper in this cause.