S. W. WHITE v. L. MARTIN HUGHES, JR., a Minor.

190. So. 446
Division B
Opinion Filed June 27, 1939
Rehearing Denied July 24, 1939

*Harry H. Martin* and *J. C. Adkins,* for Plaintiff in Error; *Austin Miller,* for Defendant in Error.

BROWN, J.—This suit was brought to recover damages

resulting from very severe injuries received by plaintiff, S. E. White, when struck by an automobile driven by defendant on the beach of the Atlantic Ocean between high and low water marks and within the corporate limits of the Town of Neptune Beach on June 11, 1934. The cause was submitted to a jury, and a verdict was returned in favor of defendant. Plaintiff brings writ of error to this Court.

In the course of the trial the judge of the lower court gave the following charge to the jury:

"Now, gentlemen, under the law of this State, the Beach of the Atlantic Ocean between high and low water mark is a public highway, and all of the laws of the State applicable to public highways are applicable to that portion of the beach exclusive of that part of the beach in the City or Town of Pablo Beach, but the public in using the beach for the purpose of bathing and recreation have rights at least equal to the rights of motorists on that part of the beach."

Plaintiff excepted to the above charge and assigned the giving of same as error, contending that it does not correctly state the law applicable to the case. This raises the question of whether the rights of pedestrians and bathers to use the beaches of the Atlantic Ocean (which have been declared to be a public highway) for bathing and recreation are superior to the use of such beaches by motorists.

This Court has held many times that a riparian or littoral proprietor, who owns to ordinary high-water mark of the ocean or Gulf or other navigable waters, has common law rights in the adjacent waters, such as access to the waters, with the rights of bathing and fishing in and navigation over such waters, in common with the general public, subject to lawful regulation by the sovereign State in the interest of the public, and subject to the authority of Congress as to commerce and navigation. Thieson v. Gulf F. & A. R. Co., 75 Fla. 28, 78 So. 491, L. R. A. 1918E, 718; Broward

v. Mabry, 58 Fla. 398, 50 So. 826; Brickell v. Trammell, 77 Fla. 544, 82 So. 221; Freed v Miami Beach Pier Corp., 93 Fla. 888, 112 So. 841, 52 A. L. R. 1177.

In Sallas v. State, 98 Fla. 464, 124 So. 27, we held that: "The fact that Atlantic and Jacksonville Beaches have been made public highways by legislative enactment in no way modifies or restricts the use and right of the pedestrian public in the use of them for lawful purposes, and we think that right equal to, if not superior to, that of the motorist. Bathing and recreation constitute the primary use of most of our beaches."

See also Town of Atlantic Beach v. Oosterhoudt, 127 Fla. 159, 172 So. 687.

"The title of the owner of lands abutting on the ocean extends to high-water mark, and such owner's riparian or littoral rights are those allowed by law in the use of the waters and of the beach or shore between high and low water mark. Such uses include access to the water from the abutting property over the beach or shore, and, in common with the public, the rights of bathing, fishing, and navigation in the waters subject to appropriate valid governmental regulations. While the primitive uses of the beach or shore are purposes incident to the use of the water of the ocean for bathing, fishing and navigation, the sovereign state may in the interest of the general welfare authorize the beach or shore to be appropriately used as a public highway, subject to a reasonable use of the beach or shore for its primary public purposes and subject to lawful governmental regulation." Adams v. Elliott, 128 Fla. 79, 174 So. 731, text 753.

There is probably no custom more universal, more natural or more ancient, on the sea-coasts, not only of the United States, but of the world, than that of bathing in the salt waters of the ocean and the enjoyment of the wholesome

recreation incident thereto.  The lure of the ocean is universal; to battle with its refreshing breakers a delight. Many are they who have felt the life-giving touch of its healing waters and its clear dust-free air.  Appearing constantly to change, it remains ever essentially the same. This primeval quality appeals to us.  "Changeless save to thy wild waves play, time writes no wrinkles on thine azure brow; such as creation's dawn beheld, thou rollest now." The attraction of the ocean for mankind is as enduring as its own changelessness.  The people of Florida—a State blessed with probably the finest bathing beaches in the world —are no exception to the rule.

Skill in the art of swimming is common amongst us.  We love the oceans which surround. our State.  We, and our visitors, too, enjoy bathing in their refreshing waters.  The constant enjoyment of this privilege of thus using the ocean and its fore-shore for ages without dispute should prove sufficient to establish it as an American common-law right, similar to that of fishing in the sea, even if this right had not come down to us as a part of the English common law, which it undoubtedly has.  See Brickell v. Trammell, 77 Fla. 544, 82 So. 221.  Private ownership stops at high-water mark.  The State holds the fore-shore in trust for its people for the purposes of navigation, fishing and bathing.  It is difficult, indeed to imagine a general and public right of fishing in the sea, and from the shore, unaccompanied by a general right to bathe there, and of access thereto over the fore-shore for that purpose.  Universal and habitual practice in England and America for many years has established this right, and it is also recognized by a statute which we will presently quote.  Small inland streams and lakes, which are not navigable and not subject to the tides, may under certain circumstances become private property to all intents and purposes.  But not so the sea, or its shore.

Section 32 of the Charter of the Town of Neptune Beach (Chapter 15356, Special Acts 1931, Laws of Florida) provides:

"* * * The ocean beach from low water mark to the bulkhead line and between the north and south limits of said Town is hereby declared to be a public highway and the Town is hereby given jurisdiction and control over the same."

Presumably the "bulkhead line" is located substantially along the high-water mark line. No town ordinances are invoked here.

Section 1, Chapter 10486, Special Acts of 1925, Laws of Florida, reads as follows:

"That the beach of the Atlantic Ocean between high and low water mark, within the confines of Duval County, Florida, be and the same are hereby made and declared a public highway, but *subject to the paramount right of the public to use the same for bathing and recreation.* That as such highway the said beach shall be under the supervision and control of the Board of County Commissioners of Duval County, Florida, and within the limitations herein, shall be subject to the laws of the State with reference to highways. Provided, however, that nothing in this Act shall be construed as prohibiting racing thereon as shall not be in violation of law, nor of the use thereof for flying machines. That the use of said beach for racing, or for flying machines, shall be under such rules and regulations as shall be prescribed for the protection of the public, and of life and property, by the Board of County Commissioners of said County. Provided, further, that nothing in this Act shall affect that part of said beach within the corporate limits of the City of Jacksonville Beach." (Italics supplied.)

Under the terms of an Act (Sec. 35, Chapter 13907, Special Acts 1929, Laws of Florida) practically identical with

the pertinent provision of the charter of the Town of Nep-
tune Beach (Sec. 32, Chapter 15356, *supra*), this Court in
Town of Atlantic Beach v. Oosterhoudt, *supra,* held that
the town was entitled to exclude vehicular traffic from parts
of the beach for certain hours during week-days of the
vacation season.

The beach of the Atlantic Ocean between high and low
water marks is the property of the State, held in trust for
the use of all the people of the State. Ferry Pass In-
spectors, etc., Ass'n. v. White River Inspectors, etc., Ass'n.,
57 Fla. 399, 48 So. 643, 22 L. R. A. (N. S.) 345; Deering
v. Martin, 95 Fla. 224, 116 So. 54; Brickell v. Trammell,
77 Fla. 544, 82 So. 221 Merrill Stevens Co. v. Durkee,
62 Fla. 549, 57 So. 428; Symmes v. Prairie Pebble Phos-
phate Co., 64 Fla. 480, 60 So. 223; *Ex parte* Powell, 70
Fla. 363, 70 So. 392; Thieson v. Gulf F. & A. R. Co., 75
Fla. 28, 78 So. 491, L. R. A. 1918E, 718; State *ex rel.*
Ellis v. Gerbing, 56 Fla. 603, 47 So. 353, 22 L. R. A. (N. S.)
337; Pembroke v. Peninsular Terminal Co., 108 Fla. 46,
146 So. 249; State *ex rel.* Landis v. Rosenthal, 109 Fla.
363, 148 So. 769.

The primary uses of most of the beaches have always
been bathing, recreation, fishing and navigation. Adams v.
Elliott, *supra;* Sallas v. State, *supra.* These primary uses
are subject to lawful regulation by the sovereign state in
the interest of the public, and subject to the authority of
Congress as to commerce and navigation. The sovereign
state may in the interest of the general welfare authorize
the beach or shore to be appropriately used as a public
highway. And most of our Florida beaches, when the tide
is out, afford marvelously perfect highways, which are
obliterated and re-built twice each day by the unseen hand
of the Almighty. However, we are of the opinion that such
an authorization for highway uses must be subject to a

reasonable use of the beach or shore for its primary and long-established public purposes, for which the State holds it in trust, and subject to lawful governmental regulations.

For the above reasons we hold that the right of the public to use the beach for bathing and recreational purposes is superior to that of the motorists driving automobiles thereon. It follows that the charge of the court above quoted was erroneous.

The evidence shows that plaintiff and three companions, Miss Alice Finlayson, Miss Nora Dean Warren and Mr. Albert Burns, went in bathing at Neptune Beach, Florida, between 8:30 and 9:00 P. M. on June 11, 1934. Plaintiff, a young man of twenty-nine years, and Miss Warren stayed in the water about thirty minutes, then being somewhat fatigued by the surf, came out and sat down at the water's edge in a place where the water came up around their feet when the breakers rolled in. The tide was receding at the time. Plaintiff was sitting facing north with the Atlantic Ocean on his right and the hard beach on his left. Miss Warren was sitting on the plaintiff's left and slightly in front of him. She was facing the Atlantic Ocean.

Defendant, a young man of nineteen years, was driving an automobile in a northerly direction, accompanied by two girls and a boy, at a speed of fifteen or twenty miles per hour. The following is defendant's very frank account of the accident as he remembered it.

Q. Now tell the jury precisely, and clearly, as you can, what happened the first time you saw Mr. White, until you stopped your car.

A. Well, when I was possibly 50 or 75 feet south of Mr. White, and as I say, 75 yards from what is known as the run-way, a car took a wide swing, that is, going from Jacksonville on to the beach, and although they were not dangerously close, as I say, they were perhaps 75 yards

away, it was natural I turn my car to the right, that it, toward the ocean, and the last minute of course, I saw two people lying on the beach, in a semi-reclining position, and considering as the car goes perhaps 25 feet a second, there wasn't much time, when I did see him. When I saw him I turned to the right, I thought I was going to miss him. I didn't lunge the brakes or anything trying to skid into the party; I turned to the right slightly, and Miss Warren, I believe, I noticed she jumped to the left, that is, toward the bulkhead. Mr. White was sitting with his— lying down, that is, in a semi-reclining position, and his feet were toward the ocean, lunged toward the ocean.

My front wheel, that is, my front left wheel ran over his ankle."

The car continued on its course after striking the plaintiff and dragged him underneath it for a distance of about 28 feet. There was no obstruction in the vicinity that kept defendant from seeing plaintiff or from avoiding him, if he had been at the time in the exercise of reasonable care. His attention was apparently diverted by the car that came out of the run-way and he failed to keep a lookout ahead of him. Defendant did not sound a warning of his approach, and the lights on his car were burning. Occupants of another automobile approximately 150 feet away, who, just before the accident, had seen the plaintiff and his companion sitting at the point where they had been struck, testified that the lights of defendant's car were focused on plaintiff. Other persons an equal distance away had also observed plaintiff and his companion sitting on the beach, but defendant, according to his own testimony, failed to observe plaintiff until he was twenty or twenty-five feet from him. These facts, indeed the overwhelming weight of the evidence and testimony, when all of it is considered,

are in our opinion sufficient to show actionable negligence on the part of defendant.

In attempting to sustain a plea of contributory negligence, which was pleaded in this case, defendant introduced testimony to the effect that plaintiff was sitting in the middle of the main traffic lane, approximately thirty or forty feet from the water, where no motorist would anticipate that a person would be sitting and where no person with any regard whatsoever for his safety would sit.

The following excerpts are from the testimony of defendant:

"Well, as I say, I didn't swerve to the right, I turned slightly to the right, when I saw a car come out of the run-way, but I believe I was still in the line of traffic. * * *

"A.   I swerved to the right, as I said, when I saw Mr. White there, when I saw him, I was about 20 feet from him, or 25 feet from him, I swerved to the right, and I believe I would have missed Mr. White, had he not moved toward the ocean.   I caught his ankle on my left front wheel.   I turned the car back in this direction, that is, toward the bulkhead, and the car stopped on Mr. White, before the left back tire had gone over his back. * * *

"A.   I do remember that he (referring to a person other than the plaintiff) asked me to call the ambulance, and I felt I was not the person to do that, considering I was driving the car, and it was my fault, and the other person —I didn't want to leave the scene of the accident, and I knew there was some other people that would call for the ambulance."

C. A. Alexander, a Duval County road patrolman, testified as follows:   He arrived upon the scene shortly after the accident.   Plaintiff was lying on the ground 30 or 35 feet from the water and defendant's car was "sitting down toward the water's edge, just a few feet from the water."

He did not know whether the car had been moved before he got there. He also testified that plaintiff and Miss Warren said they were partially covered with sand.

Miss Warren and plaintiff stated that the sand covered only their feet. Of course there must have been much sand on plaintiff's body after he had been dragged under the car for some 28 feet. Miss Warren further testified that when they sat on the beach the water "was deep enough that when sand was piled on my foot, the water came up and washed part of it out;" that they had been sitting there about ten or twenty minutes before the accident.

Miss Finlayson and Mr. Burns testified that when they came out of the water and talked briefly with plaintiff and his companion they were sitting at the edge of the water. They left plaintiff and when they had walked sixty or seventy-five yards the accident occurred.

Plaintiff stated that he had covered Miss Warren's right foot with sand; that shortly before the accident the in-coming waves would roll past them ten or twelve feet; that he and Miss Warren sat there approximately fifteen or twenty minutes before the accident occurred; that he was not covered with sand and wore a black bathing suit; that he was sitting facing somewhat toward the north, and never did see the car that struck him, which the defendant's testimony showed was approaching from the south. Plaintiff was knocked unconscious by the impact, and was carried to the hospital where he had to remain for quite a long time. Many of his bones were broken.

J. L. Burke, engineer and town marshall for Neptune Beach, was then called by defendant. He testified that he was at a filling station a short distance away when he first learned of the accident; that he arrived on the scene just after plaintiff was pulled from under the automobile; that after assisting plaintiff and helping a road patrolman with

the traffic, he began taking measurements and prepared a plat of the scene which was introduced in evidence. Burke stated that "there were indications where people had been playing in the sand, piling up a little sand, finger prints;" that this spot was then 40 feet from the water's edge at the time he made his measurements; that at low tide the beach is 400 to 450 feet wide and that the tide recedes on an average of about seventy feet an hour; that he completed his measurements "not over fifteen minutes" after his arrival on the scene.

Defendant testified that he saw a car come out of the run-way and he then turned slightly to the right; that he did not see the plaintiff till he was within 20 or 25 feet of him; that he then swerved to the right and ran over the plaintiff, and then turned the car back toward the bulkhead. Plaintiff was dragged approximately 28 feet before the automobile was stopped. Miss Reinhold and Mr. Boyd, who were in the automobile with defendant, testified that the car was about 20 or 25 feet from the water when it stopped. Other witnesses introduced by defendant testified that plaintiff and Miss Warren were sitting 40 feet from the water's edge.

The testimony as a whole, however, tends strongly to show that plaintiff was sitting fairly close to the water and not directly in the traffic lane as contended by defendant, leaving ample room for cars going north and south to pass on the hard sand to the west of plaintiff and his companion. It cannot be said that the weight of the evidence shows that plaintiff was guilty of contributory negligence in this respect.

Defendant's contention that plaintiff had covered himself with sand so that he resembled the beach upon which he was sitting and was therefore difficult to see is contrary to the weight and probative effect of the evidence.

The evidence shows that a street light was burning on

the run-way or ramp where the road from Jacksonville enters upon the beach, which light was about 75 yards away, and there was also testimony showing that defendant's automobile lights were focused directly upon the plaintiff. The moon was not shining, but the night was clear. Furthermore, several witnesses sitting in front of a cottage 150 feet away testified that they could see plaintiff and his companion sitting on the beach, though some of them testified that they appeared to be sitting in the line of automobile traffic.

Defendant also insists that plaintiff was guilty of contributory negligence in that he moved into the path of defendant's car immediately before he was struck down. The evidence shows that plaintiff and Miss Warren were sitting together on the beach, with Miss Warren on the plaintiff's left and a little north of plaintiff as defendant approached from the south. Plaintiff was facing north. Miss Warren testified that she jumped toward the bulkhead, in a westerly direction, just as she saw the automobile. The defendant's car struck the plaintiff and also glancingly struck Miss Warren as she tried to escape to the defendant's left. The evidence appears to be uncontradicted that plaintiff was struck by the left front wheel or left front side of defendant's car. This being true, all possibility of any appreciable sudden movement by plaintiff to the defendant's right, or in the path of the defendant's automobile, is most improbable and quite remote. Even if plaintiff had suddenly become aware that defendant's car was about to strike him, and, because of the terror caused by the impending peril had widely moved or jumped in the wrong direction, this would not have relieved the defendant from liability if his negligence created the dire emergency. Hainlin v. Budge, 56 Fla. 342, 47 So. 825.

In any action seeking to recover damages for injuries

to person or property, alleged to have been caused by the negligence of the defendant, all that may properly be required of the plaintiff is to establish by competent evidence the negligence of the defendant as a proximate cause of the injury, as laid in the declaration. The plaintiff is not required to prove that he was not guilty of contributory negligence. The burden of proving contributory negligence is cast upon the defendant unless the plaintiff's evidence shows it. Not only is it not essential that the whole evidence convince the jury that the plaintiff was not guilty of contributory negligence; the burden is the other way, and it has been held that if the evidence on that question is evenly balanced the fact of contributory negligence as a contributing proximate cause of the injury is not established, and upon this issue the verdict should be for the plaintiff. Hainlin v. Budge, *supra;* German-American Lumber Co. v. Brock, 55 Fla. 577, 46 So. 740; Farnsworth v. Tampa Electric Co., 62 Fla. 166, 57 So. 233. But at least it can be asserted with certainty that unless the plaintiff's evidence shows that he was guilty of contributory negligence, the burden of proving such affirmative defense rests upon the defendant who asserts it. Shayne v. Saunders, 129 Fla. 855, 176 So. 495. The law presumes, in the absence of contrary evidence, that one injured by another's negligence did everything a reasonably prudent man would have done under the circumstances to protect his own safety. Murden v. Miami Poultry, etc., Co., 113 Fla. 870, 152 So. 714.

The case of Frazee v. Gillespie, 98 Fla. 582, 124 So. 6, which involved an automobile collision on this same beach, announced some principles which are to some extent applicable to the present case. In that case, it was said:

"Even if plaintiff was guilty of negligence in thus carelessly turning to the left and then proceeding across the

path of defendant's rapidly on-coming car, without keeping a proper lookout, the defendant, if he too had been properly observant of what was happening ahead of him, could have seen the dangerous predicament in which plaintiff's car had thus been placed in plenty of time to have avoided running into it if his car was not running at excessively high speed. But instead of this, according to his own testimony, he did not see plaintiff's car at all until he was within 20 feet of it, too late, in spite of all he could do, to avoid hitting it. Evidently, from his testimony, he must have been looking so intently at the run-way to see if any cars were coming down it from the west that he failed to give due attention to cars that might be turning from the ocean driveway to ascend it. It might be said that this was a natural and easy mistake to make, that defendant's negligence consisted, not in failing to look, but in looking to the right of the highway instead of both to the right and left as well as straight ahead, and that a man cannot do all three of these things at the same instant of time.

"There may be cases of suddenly appearing dangers where this theory might apply, but this is not one of them; and it is a doctrine which must be kept within narrow limits if we are to have anything like safety upon our streets and highways with our present rapid means of locomotion. Swift as is the movement of the motorcar, human sight and mental preceptions are far swifter. The glance of the driver's eye can shift from one side of the road to the other with lightning-like rapidity, and, if the mental attention be not relaxed, and the steering gear and brakes be in good working order, the careful motor driver, exercising this comprehensive observation, can usually avoid all dangers of even heavy traffic on our streets and highways. But eternal vigilance is in these days the price of safety. And, in the operation of automobiles, due care for the safety of

life, limb and property requires this constant and unrelaxing vigilance. * * *

"Even if we admit the negligence of the plaintiff in turning to cross the path of the rapidly approaching car when it was only 150 feet away, it would still be a serious question, under the testimony in this case, whether the subsequent negligence of the defendant, in driving rapidly on without observing the plaintiff's attempt to cross in front of him until too close to avoid the collision, intervened in such a way as to constitute the sole efficient proximate cause of the collision and consequent injuries. See, in this connection, Fla. Motor Transp. Co. v. Hillman, 87 Fla. 512, 101 So. 31."

We have also held that one who has the "last clear chance" of avoiding an accident, notwithstanding the negligence of the person injured, is responsible for the injury. In the case of Merchants Transportation Co. v. Daniel, 109 Fla. 496, 149 So. 401, we held that the "last clear chance" rule applied where the driver of a motor vehicle, by keeping a reasonably careful lookout, could have discovered the injured person's perilous situation in time, by the exercise of due care, to avoid the accident, provided the injured person could not by ordinary care extricate himself from the position of peril. There are some qualifications of this doctrine which we will not go into here, but it is very probable that it could be held applicable to the facts in this case.

Giving due consideration to all the evidence in the case, we are of the opinion that the verdict of the jury was contrary to the manifest weight and probative force and effect of the evidence, and that the trial court erred in denying the motion for a new trial.

We are also of the opinion, for the reasons above stated, that the rights of bathers on this ocean beach, even though

it be also a public highway, are superior to the rights of motorists traveling thereon, and that therefore the court's charge on that subject was erroneous.

While persons using the beach for bathing purposes, or for recreation, should not needlessly or carelessly expose themselves to danger, and needlessly or carelessly get in the way of automobiles, which have the right, in the exercise of due care, to use the beach as a highway, motorists should recognize that bathers have the "right of way" to the use of the beach, not only for access to and from the water, but for reclining on the beach near the water's edge for rest and recreation between their dips in the surf, and motorists should at all times exercise a high degree of care to avoid injuring bathers and pedestrians who are using the beach for legitimate bathing and recreation purposes. On the other hand, bathers should not sit, nor loiter, nor idly stand, in the lane of automobile traffic, which is usually some yards back from the water. In other words, they should not take advantage of their superior but not exclusive right to the use and enjoyment of the ocean beach. See Sallas v. State, 98 Fla. 464, 124 So. 27.

For these reasons, the judgment of the court below must be reversed and the cause remanded for a new trial.

WHITFIELD, P. J., and CHAPMAN, J., concur.

TERRELL, C. J., concurs in opinion and judgment.

Justices BUFORD and THOMAS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.