ROBERTS, Chief Justice.
This is an appeal from a final judgment of the Circuit Court of Putnam County in favor of the defendant, appellee here, the jury having returned a verdict in its favor.
The plaintiffs are the owners of land on which there formerly erupted a spring, the *229 water from which was bottled and sold by plaintiffs. The defendant’s land is contiguous thereto; and during the course of excavation work undertaken by defendant on its land in the construction of a yacht basin, the subterranean stream which supplied water to the plaintiffs’ spring was uncovered and the flow of water from the spring eventually ceased. The plaintiff sued for damages for the loss of their spring. In Labruzzo v. Atlantic Dredging & Construction Company, Fla., 54 So.2d 673, 678, 29 A.L.R.2d 1346, we held that the second count of plaintiffs’ bill stated a cause of action and that “the defendant here should be held liable as for an intentional invasion of plaintiffs’ water rights, if its conduct under all the circumstances was, in fact, unreasonable.”
The cause went to trial on the cause of action stated by plaintiffs, as set forth in our former opinion and as amended before trial, the gist of which was that after breaking into the subterranean stream supplying plaintiffs’ spring and with knowledge of this, the defendant “with full knowledge and proceeding at its own risk, * * * so carelessly and negligently dug and excavated and pumped water from and went about its work in the basin it was constructing that the flow of the said underground water was permanently and completely diverted and interrupted from its natural channel and its natural surfacing on plaintiffs’ lands and the spring of plaintiffs was and is destroyed, to the great injury and damage of plaintiffs.” The defendant’s pleas, in effect, denied all the material allegations of the plaintiffs’ bill. As noted, the jury returned a verdict for the defendant. The plaintiffs’ motion for new trial was denied, and this appeal followed.
The plaintiffs here contend that the lower court erred in denying their motion for new trial, which attacked the sufficiency of the evidence to support the verdict.
There were some conflicts in the evidence, -but the following facts are not controverted: that shortly after the defendant’s employees began the excavation for the basin, there was uncovered an underground stream of considerable volume; that the plaintiffs’ spring ceased to flow; that the plaintiff, Mr. Labruzzo, reported this fact to the defendant’s president, one McKenzie, and stated that “to cap it or cement around it may stop it;” that on two or three week-ends immediately following the first stoppage, the flow in the spring resumed; that the defendant ceased its pumping activities on weekends and the basin (which was being excavated behind a temporary dam built to keep out the river water) would refill with water; that in a conversation among McKenzie and Labruzzo and an inspector from the State Board of Health, they discussed the likelihood of the spring’s resuming its flow after the excavation and pumping activities were completed, the dam removed, and the basin was permanently filled with water. In answer to the question, “Did you think that his well would come back when the water came back?”, Mr. McKenzie said, “I did. I think everybody did.” McKenzie also testified that he told Labruzzo “we’d pay him $60.00 a month from the time we ruined his well until the time we could let the water back up.”
According to the defendant’s witness, the crevice through which the subterranean stream erupted into the basin was 12 to 15 inches long and at least 5 inches wide at the surface, tapering off to about 2 inches a foot below the surface. At some point during the excavation work, the defendant’s employees poured into or over the crevice four yards of ready-mix concrete, weighing 4,000 pounds per yard. The concrete was poured from a ready-mix concrete truck parked on the north wall of the basin, about 12 or 15 feet above the floor of the basin, through a twelve-inch pipe held over the crevice by a cable from the drag-line. No concrete cap was formed over the crevice, apparently because the force of the erupting stream would not allow the concrete to settle. However, one of the defendant’s witnesses testified that, as to the flow of water from the crevice, the pouring of the concrete “seemed to slow it down some.” No further effort was *230 made to do anything to check the flow of the water, and no further excavation was made in the vicinity of the crevice.
There was a conflict in the evidence as to the time, in relation to the pouring of the concrete into the crevice, when the spring resumed its flow. Witnesses on both sides testified that its flow resumed two or three times on week-ends, during the cessation of pumping in the basin. However, McKenzie testified that the flow was resumed after the concrete was poured, while Labruzzo testified only that the flow was resumed two or three times immediately after the first stoppage, which was around October 9th. He did not know when the concrete was poured into the crevice, so could not testify as to that. But' the records of the concrete company supplying the concrete to the job showed that the first delivery of ready-mix concrete to the job was on October 25th, in an amount not sufficient to pour the north wall, and the next delivery on October 28th. Both- McKenzie and his foreman who supervised the pouring of the concrete into the crevice testified that the concrete was not poured into the crevice until after the north wall was poured; so the only reasonable inference to be made from the evidence is that the spring resumed its flow two or three times before the concrete was poured into the crevice. It is also uncontradicted that the spring did not resume its flow after these first two or three times.
The defendant’s theory on this appeal is that the pouring of the concrete had nothing to do with the stoppage of the spring; that the force of the water emerging from the crevice was sufficient to prevent the concrete’s setting, so that none of it went down into the crevice; that the reason the plaintiff’s spring resumed its flow in the beginning, during the cessation of pumping, was that the basin formed by the dam used during the excavation work and the walls of the basin was “sufficiently high to supply pressure enough to cause Labruzzo’s spring to flow when the basin filled” and that “it is clearly apparent that the loss of the spring resulted from the fact that when the dam was taken down, the water in the basin, controlled by the river level, was not high enough to give sufficient pressure, even with the added remaining force from the broken channel, to force the water above the height of the opening of Labruzzo’s spring.”
If this theory is correct, then the spring should have resumed its flow during work stoppage periods during the entire six or eight weeks when the excavation work was carried on behind the dam, and would have stopped only when the temporary dam was finally removed upon the completion of the basin. This was not the case. The spring resumed its flow only two or three times. And the defendant’s own witness admitted that after the concrete was poured, the flow of water from the crevice was “slowed down some”, although he also testified that it continued to flow during the entire period of excavation. To our minds, there is only one inference which reasonable men could have deduced from the evidence: that is, that the drying, up of the spring was caused by the pouring of the concrete into the crevice of the subterranean stream. No other conclusion is consistent with all the uncontroverted facts.
As to the purpose and intention of the defendant in pouring the concrete into the crevice, different inferences could have been drawn by the jury. It was possible to infer that, when this was done, the defendant had in mind only stopping the flow from the crevice in order not to have to run their pumps so much in keeping a “dry hole” in which to operate their drag-line — and without regard to preserving the flow of the stream into plaintiffs’ spring. On the other hand, the defendant contends that, in pouring the concrete into the crevice, its employees were only carrying out Labruzzo’s suggestion that the hole in the rock be capped, and there is testimony to support that contention. McKenzie testified that Labruzzo “came over and said he’d lost his spring, he’d like for me to do something about it, he didn’t *231 want to lose his. spring. I said, ‘Well, Mr. Labruzzo, we will do something about, it, if possible.’ And we did what he suggested.”
But we have no doubt that Mr. Labruzzo did not intend to suggest that the defendant should attempt to cap the opening in any manner other than that dictated by good engineering practice. The defendant’s own expert witness, a registered engineer, in answer to a question as to whether it would be possible to cap the hole by using a ready-mix concrete in the manner and under the circumstances shown above, answered, “It would be highly improbable;” and, later, that “what would do most of the work would be the rock — there may be a proportion of the rock forced down into the hole, into the chasm, * * * the sand and the cement they wouldn’t function at all. They’d just be thrown out.”
There can be no doubt here, then, that the defendant’s attempt to cap the hole-assuming that it was a bona fide attempt to do so — was not in accordance with good engineering practice, as shown by the defendant’s own witness. The chance of capping the hole was “nil” ; and the chance of clogging up the channel with rock was good.
While this court follows the rule that if there appears in the record substantial competent evidence in support of the verdict rendered, and no showing is made that the jury was deceived as to the force and credibility of the evidence, or that the jury was influenced by considerations outside the record, it is error to set aside the verdict and grant a new trial, Martin v. Stone, Fla., 51 So.2d 33, it has also been stated many times by this court that where the verdict is contrary to the manifest weight and probative force of the evidence and the. justice of the cause, the trial court should grant a new trial. Crawford v. Hinson, 108 Fla. 630, 146 So. 829, and cases therein cited; W. B. Harbeson Lumber Co. v. Anderson, 102 Fla. 731, 136 So. 557, and cases cited; White v. Hughes, 139 Fla. 54, 190 So. 446.
We think that the instant case is governed by the rule last cited. Accordingly, the judgment appealed from should be and it is hereby reversed and the cause remanded for a new trial.
HOBSON and DREW, JJ., and TAYLOR, Associate Justice, concur.