Alan S. Gold Village Attorney Bal Harbour
QUESTION:
May Bal Harbour Village enact an ordinance under the provisions of part I of Ch. 166, F. S., and its charter act regulating and restricting the manner of egress, ingress, boating, bathing, and fishing in the area of the beach within its territorial limits both landward and seaward of the erosion control line duly established pursuant to part I, Ch. 161, F. S.?
SUMMARY:
The Village of Bal Harbour may regulate in a reasonable manner the public beach within its corporate limits seaward of its duly established erosion control line to protect the public health, safety, and welfare if such regulation has a rational relation to and is reasonably designed to accomplish a purpose necessary for the protection of the public. The village may not prohibit an otherwise lawful activity on or the use of its public beach which is not inherently dangerous to the public or a nuisance per se or otherwise exercise its police power in an arbitrary, capricious, or unreasonable manner. It may not exercise its police power over those activities or subjects and in those areas which have been preempted to the state or which are in conflict with the state's paramount power to regulate and control its sovereign lands held in trust for all the people of the state; nor may it arbitrarily restrict or abrogate constitutionally recognized and protected `trust doctrine' rights or protected riparian rights of abutting upland owners. Any regulation of such rights must be necessary in order to prevent injury to and protect the public.
You state in your letter that in 1975 the Village of Bal Harbour embarked on a program to nourish and restore its beach pursuant to part I of Ch. 161, F. S., and that a beach erosion control line was duly established as required by s. 161.161. Section 161.191(1) vests title to all land seaward of the erosion control line in the state to be held by right of its sovereignty.
Except for s. 161.191(2), F. S., which, subject to the conditions set forth in s. 161.211, F. S., abrogates the upland property owners' common-law rights involving accretion and erosion, Ch. 161, F. S., preserves all common-law riparian property rights `including but not limited to rights of ingress, egress, view, boating, bathing, and fishing.' Section 161.201.
It is clear that the municipal boundary of the Village of Bal Harbour extends to encompass the public beaches sought to be regulated. See s. 1, Ch. 24386, 1947, Laws of Florida, which places the village's eastern boundary some 1,500 feet into the Atlantic Ocean. The term `public beach' is defined by s. 2(b) of Ordinance No. 200 as `that land area, legally described in the Ocean Front District of Bal Harbour Village, which is seaward of the erosion control line . . . .' Therefore, it is obvious that the land upon which activities are sought to be regulated and prohibited is state sovereignty land. It does not appear from your letter of inquiry that the village owns any of the property contiguously landward of the erosion control line. This opinion is therefore limited to principles of law concerning local regulation of activities on state-owned land and other relevant problems. Different rules and principles of law apply to the regulation of municipally owned land used for park or other purposes. See, e.g., AGO's 076-124 and 075-84.
The general principle of law applicable to this situation, subject to the below-discussed conditions and limitations, is that a municipality has civil and criminal jurisdiction over property within its corporate boundaries and may thus regulate and restrict certain activities reasonably calculated to protect the public health, safety, and welfare. See 64 C.J.S. Municipal Corporations
s. 1816 (1950); Carter v. Town of Palm Beach, 237 So.2d 130 (Fla. 1970); City of Miami Beach v. Texas Co., 194 So. 368 (Fla. 1940); Metropolitan Dade County v. Pierce, 236 So.2d 202 (3 D.C.A. Fla., 1970); and AGO's 077-139 and 060-139. This municipal power to regulate is subject to the state's paramount power to regulate and control the use of its sovereign lands. Any attempted regulation of state-owned property to the extent such regulation has been preempted by the state or is inconsistent with general law or with regulations adopted by the state would be invalid. See s. 166.021, F. S.; City of Miami Beach v. Forte Towers, Inc., 305 So.2d 764
(Fla. 1974); and AGO's 078-141, 075-167, 074-286, and 073-463. A further limitation upon a municipality's power to regulate activities upon, and use of, state-owned property, and corollary to the requirement that regulations and restrictions of certain activities must be in furtherance of public health, safety, and welfare, is that such regulation must not be in violation of constitutional protections afforded to the public for the use of, and access to, state sovereignty lands. This constitutionally derived protection is known as the public trust doctrine. See
McDowell v. Trustees of Internal Improvement Fund, 90 So.2d 715
(Fla. 1956); White v. Hughes, 190 So. 446 (Fla. 1939); Adams v. Elliott, 174 So. 731 (Fla. 1937); and AGO 073-430.
In AGO 060-139, this office expressed the view that
 [i]n so far as any ordinances adopted by the city of Fernandina Beach are not in conflict with regulations adopted by the Florida Board of Parks and Historic Memorials and the State Road Department . . . the municipal officers may enforce the ordinances in the part of the park [Fort Clinch State Park] located within the municipal boundaries.
However, as it is stated in 64 C.J.S. Municipal Corporations s. 1818c, p. 301 (1950), `in order to be valid, the regulations adopted must be reasonable and nondiscriminatory, and they must tend to promote the public health, safety, morals, or general welfare.' In Carter v. Town of Palm Beach, 237 So.2d 130 (Fla. 1970), the Florida Supreme Court held that a complete ban of all surfing within the municipal boundaries of the Town of Palm Beach was unconstitutional. The court in its holding concluded, at 131-132, that `[t]he Town of Palm Beach may regulate and control surfing and skimming in areas subject to its jurisdiction and may prohibit these activities at certain places along the beach. However, the complete prohibition of this sport from all the beach area is arbitrary and unreasonable.' I note that Ordinance No. 200, s. 2. (c)16, is a similar prohibition in that it makes it unlawful `[t]o use surfboards in waters adjacent to the public beach.' Since s. 2(b) defines the phrase `public beach' as land `which is seaward of the erosion control line,' this ordinance bans all use of surfboards within the municipal boundaries of Bal Harbour. See also Inglis v. Rymer, 152 So. 4 (Fla. 1934) (holding that prohibition of skating rinks, an activity `not inherently injurious to the prevailing conception of public morals, nor a nuisance per se' [id. at 5], is unconstitutional); and AGO 073-430 (concluding that the Okaloosa Island Authority was `without authority to ban all swimming along the foreshore of the Gulf of Mexico . . . .'). See Moffett v. State, 340 So.2d 1155 (Fla. 1976), and Atlantic Beach v. Oosterhoudt, 172 So. 687 (Fla. 1937), for examples of lawful regulation.
I note also that Ordinance No. 200 has a provision which makes it unlawful to `[s]leep in any park or upon the public beach at any time during the period from sunset to sunrise.' Section 2. (c)11. In State v. Penley, 276 So.2d 181 (2 D.C.A. Fla., 1973), the Second District Court of Appeal determined that a city ordinance of St. Petersburg which provided that `[n]o person shall sleep upon or in any street, park, wharf or other public place' was unconstitutional. The court held `that the ordinance here under scrutiny draws no distinction between conduct that is calculated to harm and that which is essentially innocent.' Id. at 181.
Another principle which may be applicable to this ordinance is that a delegation of legislative power must prescribe sufficient objective guidelines to prevent an official from arbitrarily and capriciously applying the law or exercising his discretion as to the content of the law. See City of Miami Beach v. Forte Towers, Inc., supra; City of Miami Beach v. Fleetwood Motel, Inc.,261 So.2d 801 (Fla. 1972); and Godshalk v. City of Winter Park,95 So.2d 9 (Fla. 1957). Section 2. (c)15. of Ordinance No. 200 makes it unlawful to `[h]old picnic parties where food or drinks are served or used on the public beach without having first obtained written permission from the Village Manager.' This provision leaves it totally within the uncontrolled discretion of the village manager whether to grant permission to hold a picnic on the public beach without prescribing any guidelines for the execution of a legislative power. However, any determination of the constitutionality of a duly enacted municipal ordinance is a question for judicial resolution and this office is not empowered, nor is it the policy of this office, to pass upon the validity of such ordinance.
Secondly, a municipality does not have the power to enact legislation regulating activities on state-owned public beaches which has been preempted by the state or is inconsistent or conflicts with laws or other regulations enacted or adopted by the state regulating such matters. See authority cited above. Examples of applicable general statutes preempting the regulation of the use of, and access to, state-owned beaches and saltwater activities are as follows. Section 370.102, F. S., provides that `[t]he power to regulate the taking or possession of saltwater fish, as defined in s. 370.01, is expressly reserved to the state.' See also AGO's 075-167 and 074-161, concluding that s. 370.102 preempts to the state regulation of saltwater fishing. Regulation of spearfishing is likewise preempted to the state. See
s. 370.172, F. S. (1978 Supp.). In AGO 073-463, this office concluded that s. 370.172 superseded all former local and special laws, administrative regulations, and ordinances affecting spearfishing. Regulation of boating, boat liveries, and related activities is permissible by municipalities only to the extent such regulation is not inconsistent or in conflict with the provisions of Ch. 371, F. S., or any regulations adopted pursuant to Ch. 371, or does not apply to the Florida Intracoastal Waterway. This qualification is provided by s. 371.59. In order to restrict certain areas to boating, a municipality must comply with the provisions of s. 371.522, F. S. (1978 Supp.), which, in pertinent part, provides:
 The division [of Marine Resources] shall have the power to establish any restricted area when it is determined that a safety hazard exists or there is interference with navigation. Restricted areas shall be established only after an investigation has been conducted and upon application by the governing body of the county or municipality in which the restricted areas are to be located . . . . (Emphasis supplied.)
Section 2(c)7., Ordinance No. 200, makes it unlawful to `[b]ring into or operate any boat, vessel or water craft within 300' of the bathing areas of the public beach waters within Bal Harbour Village.' A restriction such as this should be made only after an application by the municipality to the Division of Marine Resources and that agency has established the restricted area upon a determination `that a safety hazard exists or there is interference with navigation.' Regulation of beach construction, especially seaward of the beach erosion control line, has also been preempted to the state. See ss. 161.041 and 161.051, F. S. 1977, and ss. 161.052, 161.053, and 161.061, F. S. (1978 Supp.);see also Rules 16B-24 and 16B-25, F.A.C.
Further, Ch. 253, F. S., grants to the Board of Trustees of the Internal Improvement Trust Fund the authority to manage and control all sovereignty lands. Section 253.03, in pertinent part, provides:
 The Board of Trustees of the Internal Improvement Trust Fund of the state is vested and charged with the acquisition, administration, management, control, supervision, conservation, protection, and disposition of all lands owned by, or which may hereafter inure to, the state or any of its agencies, departments, boards or commissions. . . . Lands vested in the Board of Trustees of the Internal Improvement Trust Funds shall be deemed to be:
 (b) All lands owned by the state by right of its sovereignty . . . . (Emphasis supplied.)
Subsection (3) of s. 253.03, F. S., provides that `[t]he Board of Trustees of the Internal Improvement Trust Fund is hereby authorized and directed to administer all state-owned lands . . . .' Section 253.04, F. S., states that `[t]he Board of Trustees of the Internal Improvement Trust Fund may police, protect, conserve, improve; prevent trespass, damage, or depredation upon the lands and the products thereof, on or under the same owned by the state as set forth in s. 253.03.' In 1975, the Legislature transferred all the powers, duties, and regulatory authority over sovereignty lands of the Board of Trustees of the Internal Improvement Trust Fund to, and merged the board into, the Department of Natural Resources. See s. 15, Ch. 75-22, Laws of Florida, codified as s. 20.25(5), F. S. 1975. The Division of Marine Resources within the Department of Natural Resources is the state agency vested with the regulatory authority over beach erosion control property. Section 370.02(2), F. S., sets out the power and responsibility of the Division of Marine Resources.
It is evident from the above statutes that the Legislature intended that the Division of Marine Resources should be clothed with the primary jurisdiction to promulgate rules and regulations pertaining to the state beaches seaward of the beach erosion control line; and, therefore, any municipal regulation concerning activities on state beaches must not be inconsistent with rules and regulations of the Division of Marine Resources.
In sum, a municipality should not attempt to regulate activities on state-owned beaches to the extent such regulation has been preempted to the state or is inconsistent with general laws or rules and regulations promulgated by the Division of Marine Resources.
Finally, any attempted regulation of activities undertaken by a municipality on state-owned land raises issues concerning land which is held in trust for the use of all the people of Florida.See McDowell v. Trustees of Internal Improvement Fund,90 So.2d 715 (Fla. 1956); White v. Hughes, 190 So. 446 (Fla. 1939); Adams v. Elliott, 174 So. 731 (Fla. 1937); and Broward v. Mabry,50 So. 826 (Fla. 1909). See also s. 11, Art. X, State Const., which interalia provides: `The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people . . . .' The foreshore area of beaches between the mean high and low water marks and, under Ch. 161, the area seaward of the beach erosion control line, the traditional uses for which are fishing, swimming, boating, and other public purposes authorized by law, are held in trust for the public. The public trust doctrine was first applied in Florida in State v. Black River Phosphate Co.,13 So. 640 (Fla. 1893), a case involving tidal lands, a type of submerged land. The doctrine was used in 1909 to deny the power of the Board of Trustees of the Internal Improvement Fund to convey a part of the bottom of a freshwater lake. In Broward v. Mabry,supra, at 830, the Florida Supreme Court stated that state lands are `held by the state in its sovereign capacity in trust for the lawful uses of all the people . . . .' The court in Adams v. Elliott, supra, at 733, stated:
 The title of the owner of lands abutting on the ocean extends to high-water mark, and such owner's riparian or littoral rights are those allowed by law in the use of the waters and of the beach or shore between high and low water mark. Such uses include access to the water from the abutting property over the beach or shore, and, in common with the public, the rights of bathing, fishing, and navigation in the waters subject to appropriate valid governmental regulations.
This public trust doctrine requires that governmental regulation of sovereign beach lands be in furtherance of this trust and, therefore, be in the best interests of all the people.
You question more specifically whether the village may enact `an ordinance regulating and restricting the manner of ingress, egress, boating, bathing and fishing in the area of the beach within its municipal' boundaries without being in conflict with s.161.201, F.S. Section 161.201 provides:
 Any upland owner or lessee who by operation of ss. 161.141-161.211 ceases to be a holder of title to the mean high waterline shall, nonetheless, continue to be entitled to all common law riparian rights except as otherwise provided in s. 161.191(2), including but not limited to rights of ingress, egress, view, boating, bathing, and fishing. In addition the state shall not allow any structure to be erected upon lands created, either naturally or artificially, seaward of any erosion control line fixed in accordance with the provisions of ss. 161.141-161.211, except such structures required for the prevention of erosion. Neither shall such use be permitted by the state as may be injurious to the person, business, or property of the upland owner or lessee; and the several municipalities, counties and special districts are authorized and directed to enforce this provision through the exercise of their respective police powers. (Emphasis supplied.)
This section clearly evinces a legislative intent to preserve to the upland owners all of their common-law riparian rights except as provided in s. 161.191(2), F. S. (subject to the conditions set forth in s. 161.211, F. S.), having to do with the upland property owners' common-law rights involving accretion and erosion. These protected riparian rights stated in s. 161.201 include, but are not limited to, rights of ingress, egress, view, boating, bathing, and fishing. Riparian rights of the owners of land are derived from the common law as modified by statute and are an increment of property rights `of a qualified or restricted nature of which the owner ordinarily cannot be deprived without his consent or without proper compensation.' 65 C.J.S. Navigable Waters s. 61a (1966).See also White v. Hughes, supra; Eustis v. Firster, 113 So.2d 260
(2 D.C.A. Fla., 1959). The rights of riparian landowners may not arbitrarily be abrogated or restricted by the state or local government without a real relation to legitimate governmental purpose. 65 C.J.S. Navigable Waters s. 61b (1966). Further, the rights of riparian landowners are at times greater than those of the general public. See Board of Trustees of the Internal Improvement Trust Fund v. Medeira Beach Nominee, Inc.,272 So.2d 209 (2 D.C.A. Fla., 1973); Richardson v. Beattie, 95 A.2d 122
(N.H. 1953); and People v. Hulbert, 91 N.W. 211 (Mich. 1902). In the Medeira Beach case the Second District Court of Appeal at 214 stated: `The impact of governmental regulation on the rights to swim and fish may be greater on the riparian than on the public. Thus, a police power regulations prohibiting swimming, fishing, or boating may be unchallengable by the public but constitute a taking with respect to a riparian.'
These are the general rules and specific statutory provisions applicable for the protection of riparian landowners; any restriction or other regulation, unless necessary to protect the public health, welfare, safety, or morals, would be injurious to the riparian rights of the upland owner and would therefore be invalid. However, such determination presents mixed questions of law and fact which are judicial questions and beyond the authority of this office.
More generally, the application of the foregoing principles to the question of beach regulation from the point of view of impact on the general public as well as on the upland riparian owners presents complex issues of public policy and involves difficult determinations for legislative decision and ultimately judicial review which this office cannot undertake to solve or comment upon more specifically. Further, the Attorney General is without authority to determine mixed questions of law and fact or the constitutionality of municipal ordinances enacted pursuant to the police power. Nevertheless, it must be cautioned that any regulation of, or restriction upon, activities on state-owned beaches by municipalities must have a direct and real relation to the furtherance of the public health, welfare, safety, or morals. Some of the provisions of Ordinance No. 200 bear an uncomfortable resemblance to other ordinances which have been declared unconstitutional by the courts of this state. However, this office cannot undertake to determine the validity of a duly enacted ordinance which, as you are well aware, is afforded a presumption of validity. Finally, municipalities may regulate and restrict activities on the state-owned beaches only to the extent such regulation has not been preempted to the state and is not inconsistent or in conflict with general law or with rules and regulations by the state pertaining to the beaches. In conclusion, it is my opinion that the Village of Bal Harbour may regulate in a reasonable manner the public beach within its corporate limits seaward of its duly established erosion control line to protect the public health, safety, and welfare if such regulation has a rational relation to, and is reasonably designed to, accomplish a purpose necessary for the protection of the public. The village may not prohibit an otherwise lawful activity on or the use of its public beach which is not inherently dangerous to the public or a nuisance per se or otherwise exercise its police power in an arbitrary, capricious, or unreasonable manner. It may not exercise its police power over those activities or subjects and in those areas which have been preempted to the state or which are in conflict with the state's paramount power to regulate and control its sovereign lands held in trust for all the people of the state; nor may it arbitrarily restrict or abrogate constitutionally recognized and protected `trust doctrine' rights or protected riparian rights of abutting upland owners. Any regulation of such rights must be necessary in order to prevent injury to and protect the public.
Prepared by:
Craig B. Willis Assistant Attorney General